**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Herman V. KREZDORN,**
**Defendant-Appellant.**

No. 79–5427.

United States Court of Appeals,
Fifth Circuit.
Unit A

March 19, 1981.

Jerald L. Abrams, Eagle Pass, Tex., for defendant-appellant.

Le Roy Morgan Jahn, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before GOLDBERG, POLITZ and SAM D. JOHNSON, Circuit Judges.

SAM D. JOHNSON, Circuit Judge:

Appellant Krezdorn, a United States Immigration Inspector, was indicted and

charged with falsely making and forging the signature of another inspector on the applications for border crossing cards of five nonresident aliens in violation of 18 U.S.C.A. § 1426(a). In this appeal from his conviction on four of the counts, defendant-appellant contests two evidentiary rulings made by the district court: (1) Admission of thirty-two additional forgeries not charged in the indictment (and expert testimony that they were forged by Krezdorn), and (2) admission of evidence that the aliens whose applications Krezdorn was charged with forging acquired their border crossing cards by making illegal payments to a third party unrelated to defendant. Since it constituted reversible error for the district court to admit evidence of the thirty-two additional forgeries, we reverse and remand for a new trial.

A border crossing card, also called a Form I–186 and commonly referred to as a local card, is issued by the Immigration and Naturalization Service (INS) and allows a Mexican national to enter the United States for up to seventy-two hours at a time within a radius of twenty-five miles of the border.[1] Application for a border crossing card is made by use of a Form I–190, which can be obtained free of charge at a number of places, including Mexican Chambers of Commerce. To obtain an application form (Form I–190), the applicant must present a Mexican Form 13, a provisional passport that can be obtained at no cost from a Mexican Immigration Officer.[2] The applicant's biographical data is ordinarily typed on the Form I–190 at the Chamber of Commerce. After obtaining the I–190 application form, the applicant must present the provisional passport, the Form I–190, and a photograph to a contact representative at the point of entry in the United States (in this case, Eagle Pass, Texas). An interview with a United States Immigration Inspector is conducted and, if the application is approved, the inspector will so indicate on the Form I–190 and will instruct the applicant to return in forty-five days to pick up his border crossing card.[3] The Immigration Inspector signs the application and sends the form to Washington to be indexed. If no adverse information on the applicant is received during the forty-five day waiting period, the border crossing card is prepared by clerical personnel and issued by the contact representative.

Several members of the Ruiz family, all Mexican citizens, did not follow these procedures. On two separate occasions, each of five members of the Ruiz family paid 2500 Mexican pesos to Arnulfo Contreras, a resident of Piedras Negras, a Mexican border town across the Rio Grande River from Eagle Pass, Texas, to obtain their I–186 border crossing cards. Contreras helped the Ruiz family to acquire and complete their Form I–190's and Form 13's. The Ruiz family members did not then deliver their Form I–190's to the INS in Eagle Pass, but instead submitted them to Contreras in Piedras Negras. They were instructed by Contreras to return and pick them up from him a number of days later.[4] They followed these instructions. Upon return of the forms from Contreras at the appointed

---

1. An alien who intends to live in the United States is not eligible for a Form I–186.

2. In practice, Mexican officials often charge for the Form 13 and the Form I–190.

3. If an applicant must cross the border during the 45-day waiting period, he may obtain a temporary border crossing card. In that situation, the United States Immigration Inspector will give the alien a stamped copy of the Form I–190 attached to the Mexican Form 13 to use as a temporary card.

4. Two members of the Ruiz family were instructed to return in ten days and the other three were instructed to return in six weeks. Thus, they failed to have an interview with an Immigration Inspector, have their I–190 forms placed on file in Washington, or complete the obligatory 45-day waiting period. Had the required interview been conducted, it would have been discovered that the Ruizes were not eligible to receive border crossing cards since they intended either to live in the United States or to work in the United States at a distance further than 25 miles from the border.

times, the applicants took the forms directly to the port of entry at Eagle Pass and immediately received their border crossing cards. The I–190 forms received by the members of the Ruiz family appeared to have been signed by United States Immigration Inspector Francisco Valdez of Eagle Pass; however, Valdez denied ever signing them.

Appellant Krezdorn, an Immigration Inspector at the port of entry at Eagle Pass, Texas, was charged with five counts of forging Valdez's signature on the five I–190 applications. After the court directed an acquittal of Krezdorn on one count,[5] the jury found him guilty on the remaining four counts. The district court, over objection, admitted into evidence thirty-two additional I–190 forms that bore the forged signature of Valdez. These thirty-two I–190 forms were not cited or referred to in the indictments returned against Krezdorn. The court admitted expert testimony that all of these applications, the four referred

to in the indictment and the thirty-two not referred to in the indictment, were forged by Krezdorn. The thirty-two additional I–190 forms were ruled admissible under the plan or scheme exception to the extraneous offense rule, and a limiting instruction to this effect was given.[6]

The court also allowed the introduction of evidence of the payment of 2500 Mexican pesos from each of the Ruizes to Contreras. The only evidence of monetary payments introduced at trial was the testimony of the Ruiz family in explanation of the procedures they followed to acquire their border crossing cards. There was no evidence of any monetary payments to anyone with respect to the thirty-two extrinsic forgeries. The trial court found, however, that the testimony regarding the extraneous forgeries and the payments to Contreras were "so linked together in point of time and circumstances with the crimes charged that one cannot be fully shown without proving the other."

5. The indictment charged Krezdorn with forging the applications of: Count 1—Alfonso Romo-Ruiz, Count 2—Jesus Romo-Ruiz, Count 3—Eleazar Ruiz-Romo, Count 4—Alfonso Ruiz-Romo, and Count 5—Zulema Romo-de Ruiz. Count 4 was actually intended to refer to Alonso Ruiz-Romo, Alfonso's twin brother. Alonso's name had, however, been typed incorrectly on his I–190 as Alfonso.

The court directed an acquittal of Krezdorn on Count 5 because the signature of the Immigration Inspector did not appear on the carbon copy of the I–190 form in the government's possession. This opinion will henceforth refer only to four charged forgeries.

6. When the thirty-two extrinsic forgeries, designated exhibits 30 through 62, were introduced, the trial judge gave the jury the following limiting instruction:

You are instructed that you are called upon to determine the defendant's guilt or innocence solely with respect to the offenses charged in the Indictment. That's the five counts that I explained to you at the beginning of the trial. They're the five counts that the defendant is on trial for.

And, so I'll call your attention that you're instructed that you're called upon to determine the defendant's guilt or innocence solely with respect to those five offenses charged in the Indictment.

I have admitted this evidence and testimony in regard to these exhibits 30 through 62,

inclusive, relating to the alleged commission of offenses similar to those charged in the Indictment, but at different times, different dates.

This evidence has been admitted for a limited purpose—this evidence as to the alleged similar offenses has been admitted solely to establish a consistent plan or scheme, if any, on the part of the defendant.

You are to determine the defendant's guilt or innocence only as to the specific offenses charged in the Indictment. You must not convict the defendant of the offense charged in any one count of the Indictment, unless you are convinced beyond a reasonable doubt, that he committed the specific offenses charged.

Remember the defendant is not on trial for any acts or offenses not alleged in the Indictment, and that these exhibits 30 through 62 are admitted solely for your consideration in determining whether or not the evidence is a plan or scheme, if any. He's not on trial for these particular offenses, just whether or not the evidence to you is a plan or scheme, if any.

You'll be the one to determine that fact. At the close of all the evidence, the trial judge reminded the jury of this limiting instruction and repeated it in part.

## I. *The Thirty-Two Extrinsic Forgeries*

The admissibility of the thirty-two extrinsic forgeries is governed by Rule 404(b) of the Federal Rules of Evidence, which states:

 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed.R.Evid. 404(b). The rule has been interpreted by this Court in *United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978) (en banc), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979), to establish a two-pronged test for admissibility: (1) Extrinsic offense evidence must be relevant "to an issue other than the defendant's character" and (2) it "must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of rule 403." *Id.* at 911 (footnote omitted). The district court found that the evidence of the additional forgeries satisfied both elements of the test: it was relevant to the existence of a plan or scheme and its probative value outweighed its possible prejudice.

▮ Since a "plan" is not an element of the offense with which Krezdorn was charged,[7] evidence showing a plan must be relevant to some ultimate issue in the case. The contested issues in this case are (1) whether the signatures of Immigration Inspector Francisco Valdez on the applications were forged and, if so, (2) whether Krezdorn forged them. Evidence of extrinsic offenses can be used, *inter alia*, to establish the identity of a wrongdoer or the doing of a criminal act by raising a preliminary inference of a plan. For instance, evidence of an extrinsic offense may be admissible when it logically raises an inference that the defendant was engaged in a larger, more comprehensive plan. The existence of a plan then tends to prove that the defendant committed the charged crime, since commission of that crime would lead to the completion of the overall plan. This use of extrinsic evidence to establish the existence of a plan is allowed by Rule 404(b) because,

[it] involves no inference as to the defendant's character; instead his conduct is said to be caused by his conscious commitment to a course of conduct of which the charged crime is only a part. The other crime is admitted to show this larger goal rather than to show defendant's propensity to commit crimes.

22 C. Wright & K. Graham, Federal Practice & Procedure: Evidence § 5244, at 500 (1978) (footnotes omitted).

▮ The thirty-two additional forgeries do not tend to establish the existence of a larger goal of which the four charged forgeries were only a part. The four forgeries for which Krezdorn was indicted show that Krezdorn was engaged in forgery. That there were thirty-six instead of only four forged I–190's does not establish anything different. It would, at best, merely demonstrate the repetition of similar criminal acts, thus indicating Krezdorn's propensity to commit this crime. Evidence of other crimes is not admissible for this purpose.

The Court in *Beechum* discussed in some detail another circumstance in which extrinsic evidence would be considered part of a common plan or scheme: "If the uncharged offense is 'so linked together in point of time and circumstances with the crime charged that one cannot be fully shown without proving the other, the general rule of exclusion does not apply.' " 582 F.2d at 912 n.15 (quoting Slough & Knightly, *Other Vices, Other Crimes*, 41 Iowa L.Rev. 325, 331 (1956)). In the instant case, the district court specifically relied upon this exception to allow the introduction of the contested evidence.

---

**7.** The existence of a plan would be directly at issue in, for instance, a conspiracy charge.

This exception applies when evidence of uncharged offenses is necessary to explain the circumstances or setting of the charged crime; in such a situation, the extrinsic evidence "complete[s] the story of the crime on trial by proving its immediate context of happenings near in time and place." [8] McCormick, Law of Evidence § 190, at 448 (2d ed. E. Cleary 1972) (footnote omitted), *quoted in* 2 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 404[16], at 404–85 (1980). The justification for this exception is that the evidence is being admitted for a purpose other than to prove propensity:

> It may be quite impossible to prove the case without revealing other crimes. The court cannot "fragmentize the event under inquiry." If an understanding of the event in question, or if a description of the immediate circumstances reveals other crimes than those charged, exclusion will lead to a highly artificial situation at the trial making understandable testimony unlikely.

2 J. Weinstein & M. Berger ¶ 404[10], at 404–60 (footnotes omitted). Some courts have labeled this exception *res gestae*, an appellation that tends merely to obscure the analysis underlying the admissibility of the evidence.

The district court admitted the contested evidence at trial pursuant to this exception, stating that the extrinsic offense evidence was "so closely blended and inextricably wound up with the crimes charged as to constitute part of the plan or system of criminal action involved." The trial court misapplied the exception in this instance. The thirty-two extrinsic forgeries are not necessary to explain the circumstances surrounding the forgery of the four applications for which Krezdorn was charged. Evidence that the defendant allegedly committed the charged crime more times than he was charged with does not constitute part of the "system of criminal action." The admission of this evidence was an abuse of discretion.

Moreover, even if the thirty-two forgeries could somehow be considered relevant to the existence of a plan, the evidence fails to satisfy the second prong of the test for admissibility under Rule 404(b). A primary danger inherent in the admission of evidence of extrinsic offenses is that the jury might, inadvertently perhaps, punish the defendant for the uncharged activity. Here, where the extrinsic evidence involves precisely the crime with which Krezdorn was charged, to allow the introduction of the extrinsic offense evidence would be to allow the jury to be overwhelmed by the sheer numerosity of the offenses. Thus, not only does the evidence relate only to defendant's character, which is specifically prohibited by Rule 404(b), but in addition, the probative value is substantially outweighed by the unfair prejudice.

## II. *Monetary Payments to Contreras*

At the outset it is to be recalled that each of the four members of the Ruiz family paid 2500 Mexican pesos to Contreras in Piedras Negras. The evidence of the monetary payments to Contreras stands in an entirely different posture than does the evidence of the thirty-two extrinsic forgeries. This evidence involves an extraneous offense committed by a person other than the defendant. Arguably, this is not the kind of evidence to which Rule 404(b) applies. "The extrinsic acts rule is based on the fear that the jury will use evidence that

---

8. A closely related concept is that of admitting evidence of an inseparably interrelated uncharged crime because it is viewed as part of the same crime as the charged crime. Since it is part of the charged crime and not a separate crime, Rule 404(b) does not apply to exclude it. *See United States v. Aleman*, 592 F.2d 881, 885–86 (5th Cir. 1979). "It matters little whether the evidence is viewed as lying beyond the scope of Rule 404, or as satisfying the test of Rule 404(b) since it is being used to enhance the trier's understanding of the event, and not to prove propensity." 2 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 404[10], at 404–61 (1980).

the defendant has, at other times, committed bad acts to convict him of the charged offense." *United States v. Aleman*, 592 F.2d 881, 885 (5th Cir. 1979). Consequently, where the only purpose served by extrinsic offense evidence is to demonstrate the propensity of the defendant to act in a certain way, the evidence must be excluded. When, however, the extrinsic offense was not committed by the defendant, the evidence will not tend to show that the defendant has a criminal disposition and that he can be expected to act in conformity therewith. When the evidence will not impugn the defendant's character, the policies underlying Rule 404(b) are inapplicable. It would seem, therefore, that when extrinsic offense evidence is sought to be introduced against a criminal defendant, in order to trigger the application of Rule 404(b) there must be an allegation that the extrinsic offense was committed by the defendant.[9] We need not decide, however, whether Rule 404(b) applies to this situation since the evidence of the monetary payments is admissible whether or not Rule 404(b) applies.

The district court concluded that the evidence of the payments was relevant to the existence of a common plan between Contreras and Krezdorn. The court further

found that the probative value of the evidence was not substantially outweighed by the asserted unfair prejudice. If these findings are upheld, then the evidence of the payments to Contreras is admissible under either Fed.R.Evid. 402 or 404(b).

■ The district court has broad discretion to evaluate relevancy, and its determination will not be disturbed absent an abuse of discretion. There was no abuse of discretion here. The evidence of payments to Contreras is relevant to the existence of a plan between Krezdorn and Contreras whereby Krezdorn would forge an Immigration Inspector's name on Form I–190's for Contreras to sell. The existence of such a plan, in turn, tends to make it more likely—indeed highly likely—that Krezdorn forged the four charged Form I–190's, since that act would lead to the fulfillment of his overall plan.

To introduce the payments to Contreras against Krezdorn, however, some independent evidence linking Contreras and Krezdorn is required. That the forgeries occurred while the Ruizes' application forms were in the possession of Contreras, together with the substantial evidence that Krezdorn committed the forgeries, is significant evidence of concerted action between

---

**9.** A number of courts have recognized that in order to satisfy the test of admissibility under Rule 404(b), it must be shown that the defendant committed the extrinsic offense. In reference to situations where extrinsic offense evidence was offered to show the defendant's intent, the *Beechum* Court stated:

> Obviously, the line of reasoning that deems an extrinsic offense relevant to the issue of intent is valid only if an offense was in fact committed and the defendant in fact committed it. Therefore, as a predicate to a determination that the extrinsic offense is relevant, the Government must offer proof demonstrating that the defendant committed the offense.

582 F.2d at 912–13. *See United States v. Jimenez*, 613 F.2d 1373, 1376 (5th Cir. 1980); *United States v. Brown*, 608 F.2d 551, 555 (5th Cir. 1979). The Courts in *Jimenez* and *Brown* concluded that the extrinsic offense evidence was inadmissible under Rule 404(b) because there was insufficient proof that the defendants committed the extrinsic acts. In both of those

cases, however, the Government offered the evidence of the extrinsic offenses as prior acts committed by the defendants. The evidence was barred by Rule 404(b) because the Government failed to prove with sufficient certainty that the acts actually were committed by the defendants. In the instant case, there is no contention that the extrinsic offense is one committed by the defendant. In such a situation, it would seem that Rule 404(b) is not applicable. *Cf. United States v. Bates*, 600 F.2d 505, 509 (5th Cir. 1979) ("[I]t is a misnomer to characterize the testimony concerning the acts and backgrounds of the co-conspirators as 'extraneous offense' evidence. The testimony was not evidence of other crimes committed by [the defendant] himself. . . . Rather, the testimony was fully admissible evidence of the existence of an ongoing conspiracy as charged in the indictment."). The *Beechum* Court itself stated that its "analysis applies whenever the extrinsic activity *reflects adversely on the character of the defendant* . . . ." 582 F.2d at 903 n.1 (emphasis added).

Contreras and Krezdorn. Moreover, excluding from consideration for the moment the evidence that each Ruiz family member paid 2500 Mexican pesos to Contreras in Piedras Negras, the evidence presented at trial also showed that: (1) Each of the Ruizes submitted their Form I–190's, Form 13's, and photographs to Contreras in Piedras Negras rather than to the INS contact representative at Eagle Pass, (2) each failed to have an interview with an Immigration Inspector at Eagle Pass, (3) each picked up their Form I–190's from Contreras in Piedras Negras after a waiting period of less than forty-five days, (4) each application, when it was picked up from Contreras, bore a signature which purported to be that of United States Immigration Inspector Francisco Valdez, (5) substantial evidence, which was persuasive to the jury, was presented at trial that Krezdorn had forged the name Valdez on each of the four Ruiz applications, and (6) each of the Ruizes took their papers to Eagle Pass and immediately received a border crossing card although each was apparently ineligible for a local card. Despite the lack of direct evidence of an agreement between the two men,[10] the procedures by which the Ruizes acquired their border crossing cards reasonably raises an inference of a plan between Krezdorn and Contreras. Evidence that the name Valdez was forged on the Ruizes' Form I–190's during the time that those forms were in the possession of Contreras, along with the substantial evidence presented at trial that Krezdorn forged the signatures on the applications, tends to show concerted action between Contreras and Krezdorn. Thus, since there was evidence that the two men were engaged in concerted action, the evidence of the payments to Contreras, which is relevant to the existence of a common criminal plan, is admissible against Krezdorn. *See United States v. Jimenez,* 600 F.2d 1172, 1173 (5th Cir.), *cert. denied,* 444 U.S. 903, 100 S.Ct. 216, 62 L.Ed.2d 140 (1979). Finally, the district court did not abuse its discretion in reaching its conclusion that the prejudicial impact of this evidence did not substantially outweigh its probative value. The evidence of the monetary payments to Contreras was properly admitted at trial.

### III. *Extrinsic Forgeries in Conjunction With Monetary Payments to Contreras*

The Government argues that when the evidence of the thirty-two extrinsic forgeries is considered in combination with the evidence of the payments to Contreras, all of the evidence becomes admissible. This contention is not supportable. Viewing this evidence together still does not tend to establish the existence of a plan with respect to the thirty-two additional forgeries. The Government presented no evidence whatsoever that connected the thirty-two uncharged forgeries to Contreras. There was no evidence that any money was paid to Contreras, or to anyone else, by the people who received these thirty-two forged I–190's. In fact, there was no evidence that these thirty-two people even received the forged I–190's from Contreras. In view of the total absence of any evidence linking these thirty-two extrinsic forgeries to Contreras, the inference that payments to Contreras in the acquisition of the four charged forged applications somehow indicates a plan between Contreras and Krezdorn with respect to the thirty-two uncharged forgeries is unreasonable. Consequently, the inference of a plan with respect to the thirty-two forgeries is improper and the evidence of those forgeries is still inadmissible.

As the trial court committed reversible error by admitting evidence of the thirty-two extrinsic forgeries at trial, this case is reversed and remanded for a new trial.

**REVERSED AND REMANDED.**

---

**10.** The only Arnulfo Contreras that Krezdorn admitted knowing was a brick manufacturer in Piedras Negras that he met a number of years earlier when he was contemplating building a house. Krezdorn stated that he had not been in touch with this Contreras for over a year.