John R. DAGGETT, Jr., Appellant

v.

The STATE of Texas.

No. PD–0503–03.

Court of Criminal Appeals of Texas.

Dec. 14, 2005.

Nancy B. Barohn, San Antonio, for appellant.

Edward F. Shaughnessy, III, Asst. Crim. Atty., San Antonio, for state.

## OPINION

COCHRAN, J., delivered the opinion of the unanimous Court.

Appellant was convicted of three counts of sexual assault of a child under seventeen. On appeal, he argued that the trial court improperly admitted evidence of sexual assault against a second child in violation of Rule 404(b) of the Texas Rules of Evidence. The court of appeals affirmed the trial court's judgment.[1] We granted review to determine whether admission of the extraneous offense was error and, if so, whether it was harmful error.[2] We conclude that the admission of this evidence, for substantive purposes, was error, but we remand the case to the court of appeals to determine whether that error was harmful under the circumstances.

### I.

The present sexual-assault convictions are based upon proof of sexual intercourse between appellant and sixteen-year-old Brittany. The State's evidence at trial showed that appellant owned Capparelli's, a small Italian restaurant. Between 1998 and 2001, appellant employed Brittany and Hailey,[3] who was also sixteen, as waitresses.[4] Brittany testified that she and

---

1. *Daggett v. State,* 103 S.W.3d 444 (Tex.App.-San Antonio 2002).

2. Specifically, this Court granted review to resolve the following issues:

 1) Did the Fourth Court of Appeals err in finding that evidence of an extraneous third-party sexual assault was admissible in the State's case-in-chief under a "common scheme or plan" theory?
 2) Did the Fourth Court of Appeals err in finding that any error in the admission of an extraneous third-party sexual assault was harmless where appellant "opened the door"?

3. The names Brittany and Hailey were aliases used in the original indictment to protect the complainants' identities. The indictment was amended on the day of trial to substitute their real names. Because the court of appeals used the aliases in its opinion, we will do the same.

4. The original indictment charged sexual assault of both Brittany and Hailey. The trial

appellant had engaged in consensual sex on three different occasions. She described each of these occasions in detail, and included specifics regarding the layout of appellant's home (where each of the three incidents occurred), pornographic videos that appellant played, appellant's tattoos, his use of lubricants and sexual paraphernalia, and the sexual positions she and appellant engaged in.

Brittany also testified that on several occasions she stayed at the restaurant after work drinking alcoholic beverages with appellant and that she and appellant had "done speed" before each of their sexual encounters. Finally, Brittany stated that she never felt pressured or forced by appellant; all of their activities were consensual. After these encounters, she quit working at Capparelli's and, after pressing charges against appellant, she got a job at a restaurant next door to Capparelli's.

On cross-examination, Brittany agreed that she was attracted to appellant. She admitted that she had lied to appellant about her age so that he would hire her, that she had lied to her parents about where she was when she stayed at the restaurant after hours or went to bars after work, and that she had used a fake I.D. to get into bars.

Brittany's mother then testified that she made her daughter go to the police after Brittany told her about the sexual episodes with appellant.

Next, the State, over appellant's numerous objections, offered testimony by Hailey about her sexual relationship with appellant.[5] The State argued that this evidence was admissible under Rule 404(b) as showing a common scheme or plan.[6] The trial court overruled appellant's objections and permitted Hailey to testify. Appellant then requested that the trial court give the jury a limiting instruction, which it did:

> You are instructed that if there is any testimony before you in this case regarding the defendant's having committed offenses other than the offense alleged against him in the indictment in this case, you cannot consider said testimony for any purpose, unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if any were committed, and even then, you may only consider the same in determining the common plan or scheme, if any, of the defendant in connection with the offense, if any, alleged against him in the indictment in this case and for no other purpose.

Hailey testified that she went to appellant's home one night while he was having a party, had several drinks, and then passed out on the sofa. She stated that she and appellant had sex in his bedroom the next morning. Like Brittany, Hailey

---

court severed the charges prior to trial to avoid undue prejudice, but noted that evidence concerning Hailey might become admissible under a specific rule of evidence.

**5.** Specifically, appellant argued that: (1) the probative value of the evidence was outweighed by unfair prejudice; (2) it was character evidence, and under Rule 404(a) it was admissible only if the appellant "opened the door" to character evidence during his case-in-chief; (3) it was barred by Rule 404(b); and (4) it was not admissible as evidence of a common scheme or plan under Rule 404(b)

because the purpose of the common scheme or plan exception is to "bolster identification," which was not at issue.

**6.** The State, citing *Garza v. State,* 10 S.W.3d 765 (Tex.App.-Corpus Christi 2000, pet. ref'd), argued that "preparation, plan, and common scheme are just about always relevant in a case." It then noted that in the present case, the extraneous act was arguably more similar to the charged offense than in *Garza,* and therefore it was admissible as a common scheme or plan.

gave a detailed description of appellant's home, his use of pornographic videos, lubricant and sexual paraphernalia, appellant's tattoos, and the sexual positions she and appellant engaged in. Her testimony was remarkably similar to Brittany's.[7] Hailey also testified that appellant had obtained a fake ID for her so they could go to bars together; he drank alcohol with her at the restaurant and at several bars; he made flirtatious comments about her attire on numerous occasions; and he threatened to kill her if she told anybody about their sexual encounter.

On cross-examination, Hailey stated that she and Brittany were "best friends" and that they gossiped with each other and with other Capparelli's employees about appellant. Hailey admitted that she told Brittany's mother and the police about her encounter with appellant only because Brittany, when she got in trouble, told her mother that "it happened to [Hailey] too."

Appellant testified that he did not have sexual relations with either Brittany or Hailey. He denied taking either girl to bars, but admitted that he had socialized with Hailey at a bar at least once. Appellant also asserted that he would not have sex or flirt with a sixteen-year-old girl:

Q: And you heard [Hailey] say that you were flirtatious with her. Do you recall that?

A: No, sir. I would never do that in my business. If I did that with employees, I wouldn't have employees....

Q: You don't remember going in six hours after you told [Hailey] to go upstairs, and having sex with her for 20 minutes?

A: That did not happen.

Q: Okay. How do we know? She said it did.

A: I'm saying that that did not happen. I would not do something like that. That would be foolish....

Q: Any of those other times, were you making out with Brittany in the front yard?

A: I've never done anything of the sort with a sixteen year old girl period....

Q: I mean, [Brittany] described [the sexual encounter] pretty good, you know. It seemed like—

A: A fantasy of a child, basically.

Q: Why is she fantasizing?

A: I have no idea, sir. I do know what I do, and I do know what my actions have been. I am in control of myself and my thoughts and my own behavior. I absolutely would not do something like this.

Al Peche, the manager of Capparelli, testified that the restaurant employees frequently gossiped about appellant, and that it was common knowledge that appellant had tattoos and owned sexual paraphernalia. Mr. Peche said that, after Brittany had worked at the restaurant for several months, she asked him if she could work more hours. He testified that Brittany told him that "she didn't know what to do; she thought she was in love with [appellant]. She wanted to get close to him.... She needed to quit school so she could work full-time" and get closer to appellant. Finally, Mr. Peche testified that a few days before Brittany went to the police, she asked appellant to rehire her, but he refused.

The jury charge repeated the limiting instruction given during trial. During

---

7. The two witnesses' statements were identical in nearly every respect, including the same inaccuracies. For example, both girls described a "kiss mark" tattoo that appellant had on his "right butt cheek." In fact, this tattoo was on appellant's left side, not the right.

closing arguments, the State relied heavily on the extraneous offense involving Hailey as proof of appellant's guilt:

Also in the [jury] charge, there is a section that deals with what we call an extraneous offense. And the language in that—I'll go ahead and read it to you. First, the Judge provided us with a definition of relevant evidence, which says that relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than without the evidence.

Then it goes on to tell you about the extraneous offense. And this offense is the offense that the defendant committed back in February of 1999, when he sexually assaulted Hailey. First, essentially, you must find or believe that that occurred beyond a reasonable doubt; and two, you must find that it's relevant. In other words, that it tends to prove or make some—that it tends to prove any allegation in the indictment, or make any allegation in the indictment more or less probable.

Then if you do find that, you can use it in determining that there's a common scheme or plan that is occurring here. What we mean by common scheme or plan is that the defendant has some MO, or he has some way of operating, or some way of acting with regard to the way he treats the girls that he works with. And I ask you to look at the consistencies between Brittany's testimony and Hailey's testimony, and look at what is consistent.

The defendant is the owner of this restaurant with both of the girls. He hires young girls to work there at the restaurant. What does he do? He gets close to these young girls. He provides them with alcoholic beverages while he's there at the restaurant; takes them both to nightclubs—different night clubs, granted, but he nevertheless takes them both to nightclubs. He intoxicates them.

What else does he do? He takes them back to his house at 400 Travertine. Once back at the house, what does he do with both girls? He takes them up to his bedroom. While he's up in his bedroom, he undresses both girls, he engages in sexual intercourse with them. But that's not all he does with both girls. What else does he do? He displays pornographic images to them. Both of them testified about that. What else does he do? He uses what has been described in this trial as cock rings when he has sexual intercourse with them. He uses a lubricant when he has sexual intercourse with both of them.

Ladies and gentlemen, this is common scheme or plan that we're talking about, and that's why that evidence was brought before you so you could see exactly the way this defendant operates and the way that he treated both of these young ladies.

We ask that each and every one of you sitting here as jurors, please do not—we respectfully ask you do not buy into the defendant's conspiracy theory. That's all it is. If you notice, he has an answer for every single thing that the state brought up before him. He's going to tell you this is a big conspiracy, and that these girls got together and they fabricated this lie and brought this to the police's attention.

But you remember the testimony. There was no motive for either one of these girls to do this. The defendant said that. The mother of Brittany also told you that it was her—she was the one who was upset about this. She was the one that had to convince Brittany

that this was the right thing to do. Brittany did not have any axe to grind with this defendant. . . .

The jury found appellant guilty on all three counts.[8]

During the punishment phase (but outside the presence of the jury), the court articulated the balancing test it used in its Rule 403–404(b) ruling and said that the "fact of consequence" for which the extraneous offense evidence was admitted was "that [appellant] engaged in sexual intercourse with a minor. Whether he did it, in other words." The court stated that the State offered the evidence "[not] necessarily to prove, but certainly to support the allegation of the underlying offense." Appellant then moved for a mistrial, arguing that evidence is not admissible under the common scheme or plan exception to 404(b) unless the "the defendant engaged in the extraneous offense as part of the plan to commit the offense on trial. In other words, what [the State] has to show is that Mr. Daggett engaged in, or committed the first sexual assault against Hailey as part of a plan to commit a sexual assault against Brittany." The trial court denied appellant's motion for mistrial.

On appeal, appellant argued, *inter alia*, that the trial court abused its discretion by admitting the extraneous offense under the common scheme or plan exception. He noted that "the State offered no evidence to show that Appellant's extraneous conduct with Hailey was in any manner part of a larger goal directed toward the accomplishment of sexual intercourse with Brittany." The State argued that, even if the evidence was erroneously admitted as part of a common scheme or plan, any error was cured when appellant testified that he had never, and would never, commit such an act with a sixteen-year-old girl.

The court of appeals found that "[t]he similarities between the testimony given by Brittany and Hailey is logically relevant and detailed enough to constitute admissible evidence of a common plan or scheme." [9] The court noted appellant's argument that the evidence was not admissible under the common scheme or plan exception, but then stated,

> In the instant case, Daggett opened the door during his direct examination when he stated, "I would not do something like that," and "I have never done anything of the sort with a 16 year old girl period." Daggett's denials opened the door and made it permissible for the State to call Hailey. Therefore, even if it was error for the trial court to admit this evidence, Daggett's subsequent denials cured any possible harm caused by the admission of this evidence.[10]

The court of appeals affirmed the trial court's judgment.

## II.

■ Generally, evidence of extraneous offenses may not be used against the accused in a criminal trial.[11] While such

---

**8.** It assessed punishment at two years' imprisonment on the first count and two years' probation on the other two counts.

**9.** *Daggett*, 103 S.W.3d at 448.

**10.** *Id.* (citations omitted).

**11.** The common-law rule dates back to well before enactment of the Texas Rules of Evidence. For example, in 1919, this Court stated "[the] general rule of evidence is that evidence of extraneous crimes is not received." *Haley v. State*, 84 Tex.Crim. 629, 633, 209 S.W. 675, 677 (1919); *see also Crank v. State*, 761 S.W.2d 328, 342 (Tex.Crim.App.1988) (stating that extraneous offenses are generally inadmissible because the propensity of the accused to commit crimes is immaterial in determining his guilt for the crime charged against him). Rule 404(b), which codified

evidence will almost always have probative value, it forces the defendant to defend himself against uncharged crimes as well as the charged offense, and encourages the jury to convict a defendant based upon his bad character, rather than proof of the specific crime charged.[12] However, the general prohibition against the admission of extraneous offenses to prove a defendant's character or propensity to commit the crime carries with it numerous exceptions. One such exception under Rule 404(b) is proof of the defendant's "plan," [13] frequently, but misleadingly, termed "common scheme or plan."

■ When used properly, the "plan" exception allows admission of evidence to show steps taken by the defendant in preparation for the charged offense.[14] For

example, if the defendant steals a car on Monday, buys a machine gun on Tuesday, pastes together a robbery note on Wednesday, parks illegally in front of the Wells Fargo building on Thursday while casing out the bank, and then robs the bank on Friday using the machine gun and driving off in the stolen car, all of the extraneous acts are relevant to prove each step of the defendant's ultimate plan to rob the bank.

■ Unfortunately, courts frequently admit evidence of extraneous acts under this exception not to show acts the defendant took in preparation for the ultimate charged offense, but to show repeated acts that are similar to the charged offense.[15] Repetition of the same act or same crime does not equal a "plan." [16] It equals the

---

this common law rule, states in part: "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith."

12. *Albrecht v. State*, 486 S.W.2d 97, 100 (Tex. Crim.App.1972) (noting that evidence of extraneous offenses "is inherently prejudicial, tends to confuse the issues in the case, and forces the accused to defend himself against charges which he had not been notified would be brought against him").

13. Rule 404(b) sets out an illustrative, not exhaustive, list of exceptions to the prohibition against admitting evidence of extraneous offenses including "proof of motive, opportunity, intent, preparation, *plan*, knowledge, identity, or absence of mistake or accident." (emphasis added).

14. *See Boutwell v. State*, 719 S.W.2d 164, 181 (Tex.Crim.App.1986)(op. on reh'g.) ("Central to the common plan or scheme exception is that there be a plan or scheme and the extraneous offenses are steps taken towards the accomplishment of the plan."); *see also Haley*, 209 S.W. at 678. In *Haley*, we explained: [w]hen the very doing of the act charged is still to be proved, one of the evidential facts receivable is the person's design or plan to do it. To render them admissible, there must be not merely a similarity in the re-

sults, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.... To show a plan to rob a safe, the stealing of the key would be relevant; or to show a plan to murder a whole family and obtain their insurance money, the killing of other insured members of the family would be admissible.
*Id.* at 678 (quotations omitted).

15. *See, e.g., Garza v. State*, 10 S.W.3d 765 (Tex.App.-Corpus Christi, 2000, pet. ref'd). In *Garza*, the appellant, an owner of a motel, was charged with the sexual assault of a twelve-year-old employee. *Id.* at 766–67. The State offered evidence that appellant had previously assaulted a different underage employee in a similar manner. *Id.* at 771. The court of appeals stated that the extraneous offense showed appellant used his position of authority to lure young girls into a position where he could assault them, and thus was admissible for the purposes of showing a common scheme or plan. *Id.* at 772.

16. *See United States v. Krezdorn*, 639 F.2d 1327 (5thCir.1981). In *Krezdorn*, the government offered evidence of 32 extraneous offenses of forgery to prove the defendant committed the charged offense of forging four documents. *Id.* at 1330. The court stated that

repeated commission of the same criminal offense offered obliquely to show bad character and conduct in conformity with that bad character—"once a thief, always a thief." This bad-character-conformity purpose, whether express or not, is precisely what is barred by Rule 404(b).[17] Thus, if the proponent is unable to articulate exactly how an extraneous act tends to prove a step toward an ultimate goal or overarching plan, the evidence is not admissible to prove part of a "plan."

■■■ This does not mean, however, that such evidence will always be inadmissible.[18] If a defendant testifies to a blanket statement of good conduct or charac-

ter—*e.g.,* "I would never have sex with a minor"—he may "open the door" by leaving a false impression with the jury about a relevant act or character trait. Evidence of an extraneous act that tends to rebut such testimony may be admissible to impeach the defendant.[19] When such evidence is admitted, however, the jury may not consider it as substantive evidence of the charged offense, but only as evidence that the defendant misrepresented himself. Thus, upon request, a judge must provide a limiting instruction informing the jury that they may use the evidence only to gauge the defendant's credibility, not as any proof that he is guilty of the charged

---

[t]he thirty-two additional forgeries do not tend to establish the existence of a larger goal of which the four charged forgeries were only a part. The four forgeries for which Krezdorn was indicted show that Krezdorn was engaged in forgery. That there were thirty-six instead of only four forged I–190's does not establish anything different. It would, at best, merely demonstrate the repetition of similar criminal acts, thus indicating Krezdorn's propensity to commit this crime. Evidence of other crimes is not admissible for this purpose. *Id.* at 1331.

**17.** *Michelson v. United States,* 335 U.S. 469, 475–76, 69 S.Ct. 213, 93 L.Ed. 168 (1948); *Crank v. State,* 761 S.W.2d 328, 341 (Tex. Crim.App.1988).

**18.** In some instances, evidence of a remarkably similar act might be admissible to prove the *corpus delicti* (the crime itself), intent, or lack of consent under "the doctrine of chances." *See, e.g., Martin v. State,* 173 S.W.3d 463, 465 (Tex.Crim.App.2005) (lack of consent); *Robbins v. State,* 88 S.W.3d 256, 265–69 (Tex.Crim.App.2002)(Cochran, J., concurring) (corpus delicti); *Plante v. State,* 692 S.W.2d 487, 491–92 (Tex.Crim.App.1985)(intent). Here, however, where the two witnesses were "best friends" and regularly gossiped about appellant, "the doctrine of chances" might be equally applicable to prove the commission of the charged offense *or* the fabrication of the testimony. *See Fox v. State,* 115 S.W.3d 550, 559–62 (Tex.App.-Houston

[14th Dist] 2002, pet. ref'd) (defendant could employ "doctrine of chances" to prove that similar stories of defendant's purported sexual acts were the result of fabrication).

**19.** *See Prescott v. State,* 744 S.W.2d 128 (Tex. Crim.App.1988). In *Prescott,* the defendant testified that it was his "first time going through this." *Id.* at 130. The trial court held that this statement gave a false impression to the jury that the defendant had no criminal record. *Id.* In affirming the trial court's ruling, this Court stated:

When the accused leaves such a false impression during his direct examination, he is commonly said to have "opened the door" to an inquiry by the State as to the validity of his testimony. Accordingly, the State is allowed, during cross-examination, to do what it could not otherwise do. That is, dispel the false impression left by the accused as to his past, a subject which is usually an irrelevant issue, collateral to the case, and thus inadmissible.

*Id.* at 131. *See also Garcia v. State,* 454 S.W.2d 400, 406 (Tex.Crim.App.1970) (allowing testimony that defendant had previously been in fights to rebut false impression left by defendant that he was an "inexperienced" fighter who was afraid of complainant); *Hernandez v. State,* 897 S.W.2d 488, 494 (Tex. App.-Tyler 1995, no pet.) (defense counsel's question, "Have you ever had any other type of problems with the law?" and defendant's answer of "No," opened door to fact that defendant was wanted for murder in Mexico).

offense.[20]

## III.

■ In the present case, the trial court admitted Hailey's testimony about her sexual relationship with appellant as evidence of a common scheme or plan to have a sexual relationship with Brittany. However, the State failed to articulate any logical link between the sexual interlude with Hailey and an ultimate goal or plan to have a sexual relationship with Brittany.[21] While, as the court of appeals pointed out, the two offenses share numerous characteristics, "[a] series of similar acts are not enough to show a common plan or design."[22] Therefore, we find the lower courts erred in finding the evidence of the sexual encounter with Hailey admissible under the "plan" exception to Rule 404(b).

■ The court of appeals also found, however, that appellant "opened the door" by stating "I would not do something like that," and "I have never done anything of that sort with a sixteen year old girl, period."[23] We agree. The State could introduce evidence of appellant's sexual conduct with Hailey to rebut these sweeping statements disavowing any sexual misconduct with minors.[24] While generally such evi-

---

**20.** *See generally,* Tex.R. Evid. 105(a); *see also Prescott,* 744 S.W.2d at 133 (finding that the limiting instruction given did not properly limit use of testimony of an extraneous offense to impeachment purposes only).

**21.** Of course, evidence that appellant plied Brittany with alcohol to lower her resistance, trespassed in the park and illegally plucked bluebonnets to present her with a nosegay, and stole a pie from a kitchen window sill to impress her with his culinary skill would be admissible as steps in an ultimate plan to seduce a minor.

**22.** *Boutwell,* 719 S.W.2d at 180.

**23.** Appellant directly denied any propensity to commit the acts he was charged with at least four separate times. Two of these four statements related directly to his relationship with Hailey. If evidence of the extraneous offense involving Hailey had not been admitted during the State's case-in-chief, appellant would not have made these comments. However, the two statements appellant made relating to the charged offense ("I've never done anything of the sort with a sixteen year old girl period," and "I absolutely would not do something like this") were enough to open the door to rebuttal impeachment evidence involving Hailey.

**24.** When a witness makes a broad statement of good conduct or character on a collateral issue, the opposing party may cross-examine the witness with specific instances rebutting that false impression, but generally may not offer extrinsic evidence to prove the impeachment acts. Where, as here, the defendant's statement of good conduct is directly relevant to the offense charged—i.e., "I would never have sexual relations with a minor"—the opponent may both cross-examine the defendant and offer extrinsic evidence rebutting the statement. This is not impeachment on a collateral matter. The statement of good conduct goes to the "heart" of the matter. *See, e.g., United States v. Antonakeas,* 255 F.3d 714, 724–25 (9th Cir.2001). In *Antonakeas,* the Ninth Circuit stated,

> Rule 608(b) prohibits the use of extrinsic evidence of conduct to impeach a witness' credibility in terms of his general veracity. In contrast, the concept of impeachment by contradiction permits courts to admit extrinsic evidence that specific testimony is false, because contradicted by other evidence:
> Direct-examination testimony containing a broad disclaimer of misconduct sometimes can open the door for extrinsic evidence to contradict even though the contradictory evidence is otherwise inadmissible under Rules 404 and 608(b) and is, thus, collateral. This approach has been justified on the grounds that the witness should not be permitted to engage in perjury, mislead the trier of fact, and then shield himself from impeachment by asserting the collateral-fact doctrine.

*Id.* at 724–25 (quoting *United States v. Castillo,* 181 F.3d 1129, 1132–33 (9th Cir.1999), and quoting 2A Charles A. Wright & Victor J.

dence is admissible only during the State's rebuttal, we have previously found that, if extraneous offense evidence is improperly introduced during the State's case-in-chief, any error may be cured by the defendant's subsequent testimony which "opens the door" to rebuttal.[25]

 However, appellant argues that the court's limiting instruction, which allowed the jury to consider Hailey's testimony as proof of appellant's "plan," combined with the State's closing argument,[26] improperly permitted the jury to consider this testimony for its substantive value. We agree.[27] Because Hailey's testimony was admissible only to rebut appellant's blanket statement of good conduct with

minors, the trial court should have given the jury an instruction that it could use that testimony *only* in assessing appellant's credibility, not as any proof that he committed the charged offense or as any proof of some "plan" to have a sexual relationship with Brittany.

Here, the court of appeals correctly determined that any harm caused by the error in admitting Hailey's testimony was cured when appellant "opened the door" to its admission during his testimony. However, the trial court also committed error by allowing the State to use the extraneous offense as substantive evidence of the charged offense. Because the court of appeals did not assess the potential harmful-

---

GOLD, FEDERAL PRACTICE AND PROCEDURE § 6119 at 116–17 (1993)).

**25.** *See Siqueiros v. State*, 685 S.W.2d 68, 71 (Tex.Crim.App.1985) ("where an extraneous offense may have been improperly admitted in the State's case-in-chief, subsequently admitted evidence can render the error harmless").

**26.** Appellant argues that the trial court also committed error by allowing the State to use the extraneous offense as substantive evidence of the charged offense because the limiting instruction was both incorrect and it failed to define "plan." The State, during its closing argument, gave a definition of "common scheme and plan" which encouraged the jury to use the evidence for its substantive purpose of proving appellant had a propensity for sexually assaulting young girls:

> What we mean by common scheme or plan is that the defendant has some MO, or he has some way of operating, or some way of acting with regard to the way he treats the girls that he works with. And I ask you to look at the consistencies between Brittany's testimony and Hailey's testimony, and look at what is consistent.
>
> . . .
>
> Ladies and gentlemen, this is common scheme or plan that we're talking about, and that's why that evidence was brought before you so you could see exactly the way this defendant operates and the way that he treated both of these young ladies.

**27.** The State argues that this Court did not grant review to determine whether the charge was proper, but only to decide whether the evidence was properly admitted. This is not entirely accurate. Appellant's second ground for review poses the question of whether admitting Hailey's testimony offered to show appellant's "plan" in the State's case-in-chief was harmful error when appellant later "opened the door" to that evidence for impeachment purposes.

The State also argues that appellant's failure to object to the charge in the trial court and his subsequent failure to argue this point on appeal precludes him from raising the issue with this Court. While a defendant must generally object to errors made during trial in order to preserve them for appeal, we require only that objections to be based on arguments and rulings made *during* the defendant's trial. Appellant timely objected to the admission of the evidence and was overruled based on the State's argument that the offense was proof of a "common scheme or plan." He promptly requested a limiting instruction and vigorously fought to insure that the instruction comported to the trial court's ruling. We cannot demand his use of a crystal ball to divine theories of admissibility which *might be* presented on appeal, but which were not argued in the trial court. We therefore reject the State's argument that because appellant did not previously raise the issue of an improper limiting instruction, he must show "egregious harm."

ness of this testimony being misused for *substantive* purposes when it was admissible only to impeach appellant's credibility, we will defer to that court to conduct this harm analysis. We therefore vacate the judgment of the court of appeals and remand the case for further proceedings consistent with this opinion.