

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-18-00202-CR

_____

AARON TYLER CRUM, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 8th District Court
Hopkins County, Texas
Trial Court No. 1826585

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Chief Justice Morriss
Concurring Opinion by Justice Burgess

# MEMORANDUM OPINION

Not long before dawn in late February 2018, after a long night of drinking, game playing, and socializing with a group of acquaintances, Aaron Tyler Crum shot and killed Josh Cowling at Crum's house in Hopkins County. Evidence conflicted regarding the events that immediately led to the shooting, as it did regarding which of the two men was the primary aggressor and whether Crum shot Cowling in self-defense. The jury rejected Crum's claim of self-defense, found him guilty of murder, and assessed a fifty-year sentence. On appeal, Crum urges ten points of error, including alleged errors in admitting unqualified expert testimony and evidence of Crum's prior bad acts, in limiting his cross-examination of a witness, in allowing certain jury argument by the State, in charging the jury, in finding against his claim of self-defense, and in injuring him with the cumulative effect of the alleged errors.

We affirm the judgment of the trial court because (1) notwithstanding Crum's self-defense claims, his murder conviction is supported by this record, (2) admitting blood-spatter testimony was harmless error, (3) admitting evidence suggesting Crum's aggressiveness was not an abuse of discretion, (4) limiting impeachment cross-examination of Horton was not error, (5) permitting the State to argue good versus evil was not error, (6) none of the four challenged jury instructions constituted error, and (7) cumulative error cannot occur without multiple errors.

*(1)*     *Notwithstanding Crum's Self-Defense Claims, His Murder Conviction Is Supported by this Record*

In the hours before the shooting, Tadarius Johnson went to a local Sulphur Springs bar with his friend, David Brantley. Crum, who had met Johnson at the bar a couple of weeks earlier, joined the pair there. The three of them had a few drinks, played pool, and visited with some other patrons

2

in the bar. Around the time the bar closed, Crum and Johnson took an Uber to Crum's house so they could continue drinking and visiting. A short time later, Desiree Pharis, Kelsey Cullins, Roy Taylor, Summer Sanders, and Brantley arrived at Crum's house.[1] Also, Jessica Horton's brother, Cowling,[2] dropped her off at the get-together. According to Johnson, Cowling came inside the house briefly, had a beer, and then left.

While at Crum's house, the group "was just drinking, playing beer pong, talking, stuff like that." Johnson said that he had not had much to drink, but that the others drank a "fair amount." The group drank throughout the night, including vodka and beer. According to Johnson, things were fairly normal during the night, but eventually, "things changed." Johnson explained, "[Crum] was making advances toward [Sanders], and she -- she wasn't really buying it at the time. And, also, [Pharis'] boyfriend, [Taylor], was . . . intervening because I -- I'm assuming he didn't really trust [Crum] that well. . . . And then that's when [Crum]'s demeanor really started to change . . . ." When asked what that meant, Johnson stated, "[Crum] was just getting really quiet, a blank stare like something had made him mad, you know."[3] Johnson said he had never seen Crum act like that.

---

[1]The group had also been at the bar.

[2]The indictment against Crum states that, on February 24, 2018, he "did then and there intentionally or knowingly cause the death of an individual, namely, JOSHUA PAUL COWLING, by shooting him with a firearm."

[3]Taylor conceded that he told Crum to leave Sanders alone because she had a baby and a boyfriend. He stated that Crum did not physically or verbally confront him in response to his request. Taylor said that Crum's demeanor did not become threatening, but that he became a bit livelier and more talkative. He also said that he could tell that Crum was becoming frustrated during the evening.

Sanders, Pharis, and Taylor then left Crum's house. Johnson stated that, at that point, Crum still had a blank stare on his face and was saying "off the wall stuff." According to Johnson, Crum said, "[I]f I ever see that . . . guy again, I'm going to kick his ass . . . ."[4] Johnson stated that, although Taylor had been "interfering," he had not been loud. Johnson said, "I could just -- just see that [Crum] was angry. It . . . was pretty clear. Nobody knew what he was angry about." Johnson stated that it took "a little bit" of time to get Crum settled. By that point, the party had begun to drag "[b]ecause . . . the -- mood was just gone." As the party was winding down, Cowling returned to Crum's house to pick up his sister, Horton. Horton introduced Cowling to Crum, and they shook hands.

Johnson explained further that, during the evening, people would step out onto the patio to smoke or "chill[] out." Johnson said that he recalled Cowling being outdoors on the patio. According to Johnson, Cowling's demeanor toward Crum was "pretty normal." At around 4:15 a.m., while the group was outside on the patio, Crum went inside the house and shut and locked the door. Johnson then realized that "some people had some stuff up in the house, and that's when everyone was trying to get hold [sic] of [Crum]."

Johnson unsuccessfully tried to contact Crum with his cell phone.[5] Johnson said that, while other people were attempting to text Crum, he heard a glass break, so he went back to the porch to see what had happened. Johnson stated, "There was glass all over the floor. Cowling was standing -- [Cowling] and [Horton] were both standing in that area where the glass was broken, and that's

---

[4]Johnson said Crum was referring to Taylor.

[5]Johnson left the porch to try to get cell service.

4

when [Crum] came to the door with the gun." Johnson said that Crum was pointing the gun at Cowling, "[a]nd we were just talking -- you know, [Horton and Cowling] were like, hey, the door is going to get paid for . . . ." It was Johnson's impression that Cowling broke the glass door on purpose in order to get their belongings from inside the house.

Johnson testified that, after the glass broke, Crum "was just saying stuff like, I am a . . . Marine, stuff like that." According to Johnson, Crum then went back inside the house, put the gun down, then returned outside and began hitting Cowling. Johnson said that they began to scuffle, and he attempted to separate the two of them.[6] Eventually, Johnson was able to separate Crum and Cowling.[7] When asked which individual had been the aggressor, Johnson said, "I would have said [Crum] . . . because, like I said, at the time, he walked out and started hitting . . . Cowling." About that time, Johnson told Brantley to go get in his truck. Johnson then turned around to go see about Cowling, when he heard a gunshot and "saw [Cowling]'s body hit the ground."[8] Seconds later, Johnson ran to the truck. Kelsey Cullins also got in the truck with Brantley and Johnson, and they left Crum's house. From there, Johnson, Brantley, and Cullins stopped briefly at a gasoline station and then went to Cullins' mother's home and contacted 9-1-1. They waited there until the police arrived and took their written statements.[9] Johnson said that the reason he left

---

[6]Brantley also tried to separate Crum and Cowling.

[7]According to Johnson, both parties fell to the ground, and then Crum went back inside the house.

[8]Johnson did not hear Crum say that he was in fear for his life.

[9]They also participated in recorded interviews at the police station.

5

Crum's house so quickly was because he was in fear for his life. When asked who he was afraid of, Johnson stated that he was afraid of Crum.

According to Johnson, during the incident, he never saw Cowling go inside Crum' house, attempt to go inside Crum's house, or say anything about going inside his house. Johnson said he never saw Cowling being aggressive or doing anything that might have made anyone fearful for their life. When asked if Cowling acted in an apologetic demeanor after the glass shattered, Johnson said that he had.

Cowling's sister, Horton, testified that everything seemed normal while the group was at the bar and that Brantley had asked her to stop by Crum's house when the bar closed. Horton explained that Cowling dropped her off at Crum's house, but that he came in the house only "for a second."[10] According to Horton, Cowling did not meet Crum before leaving the house.

In addition, Horton explained that Cowling had struggled with addiction for a fair amount of his life. She stated that his problem centered around his use of alcohol, but that he had used "marijuana, some meth here and there, you know.[11] Just about . . . anything that I know of, he's tried or has done." Horton said that, although Cowling had issues with drugs and alcohol, the only person he had ever harmed was himself. "He would get real down, depressed about himself." But, according to Horton, Cowling was not "a guy looking to fight people."

---

[10]Horton said Cowling dropped her off at Crum's around 1:00 o'clock in the morning.

[11]According to Horton, Cowling did not appear to be "really intoxicated" the night of the shooting. She said, "[H]e wasn't slurring. He wasn't being loud." Horton said that, when Cowling was "really intoxicated . . . you can see [his] demeanor change, and he seemed fine."

Horton also stated that everybody was drinking inside the house that night, but that when they wanted to smoke cigarettes, they would go outside on the porch. In her opinion, everyone at the party was over the legal limit of intoxication, including Crum.[12] When asked about Crum's demeanor that night, Horton said,

> I mean, at first he seemed fine. He was happy. We were all playing a game together. Then something went on. I am not sure exactly what happened because they were all in another room, and I was in the living room area. But then he came out and he was -- he was angry. He was upset, ready to fight somebody.

She stated that, when some of the party-goers left, Crum "was still really angry. We all tried to console him, but he had his fists clenched and kept saying, you know, I want to kill that guy." Horton said that she told Crum to "chill out" and that "[h]e seemed to calm down a little bit more than what he was." Around that time, Horton texted Cowling, asking him to come pick her up at Crum's house. When Cowling arrived, he entered Crum's house for a second time and, at that time, Horton introduced Cowling to Crum.[13] The pair shook hands and, shortly after that, everyone, with the exception of Crum, went back outside to the porch to smoke.

Horton explained that, while the group was outside talking and smoking, they noticed that Crum had locked the door, despite the fact that their personal belongings were still inside his house. Horton sent a text message to Crum, asking him to let them in so they could get their belongings.[14]

---

[12]Sanders testified that Crum did not appear intoxicated.

[13]Horton stated that, when Cowling arrived at Crum's house, he did not appear erratic or aggressive.

[14]In one of her text messages to Crum, Horton stated, "Hey, dude, all is cool, just need to get stuff." When asked what her text meant, Horton explained, "Well, because we didn't really realize why he shut the door or what -- what the problem was, so I was like, we're fine, we just need to get our stuff."

She also tried to contact Crum by calling his telephone several times. Horton stated that they intended to leave as soon as they got their belongings. According to Horton, Crum never indicated to them that he wanted them to leave his property and did not respond to her telephone calls or text messages. Horton described what happened next:

> While me and [Brantley] were sitting there and we were trying to get hold [sic] of Crum, [Cowling] was over there just kind of sitting on the ledge. And he was like, well, why don't we just knock on the door because we had discussed that maybe Crum was passed out. So that's when [Cowling] -- he just got up, and he went to the door. And, before I knew it, the glass was broke everywhere.

Horton then saw Cowling showing her his hand. Horton said, "[I]t was bleeding real bad. And I just looked at him, and I was like, we need to get you to the hospital. And, at that time, Crum was right there at the door with the gun." According to Horton, Crum was "ready to shoot." Horton said that she was shocked when she saw Crum with the gun and that Cowling "automatically put his hands up, and he said, I'll fix the door, I'll fix the door." Horton then reminded Crum that Cowling was her brother and that they would fix the door.

According to Horton, it was at that point that Crum came out on the porch and "just started beating on" Cowling.[15] Horton stated the Cowling tried to defend himself. She said that, after Cowling pushed Crum off of him, the next thing she saw was Crum at the door with the gun. Horton explained, "That's when [Crum] looked straight at me and with -- it was a very cold look and looked me straight in the eye, and he just said, I -- I fear for my life, and he pulled the trigger."

---

[15]Horton said that, when Crum came out on the porch and was walking toward Cowling, she did not see the gun.

Immediately after Crum fired the gun, Cowling fell to the ground, and Horton called 9-1-1 on her cell phone.

When describing Crum's behavior after he shot Cowling, Horton said, "He had no emotion really, anything . . . . I recognized that he was standing up against the brick wall, and he was just kind of standing there . . . ." Horton told the 9-1-1 operator that "it was a misunderstanding. He was in fear for his life." She also told the 9-1-1 operator that Cowling did not threaten Crum. Horton said that "[she] just wanted to calm the situation. [She] was just -- [she] was trying to get [her] brother help and, at the same time, try to keep [her]self safe."[16] While Horton was on the phone with the 9-1-1 operator, Crum attempted to revive Cowling by using cardiopulmonary resuscitation (CPR).

Cullins testified that, on the night of the incident, she went to the bar to meet Crum and Brantley. Before that evening, Cullins had had very little contact with Crum. Cullins said she rode to Crum's house with her best friend, Cody Wilson,[17] so that they could continue to socialize. According to Cullins, when they arrived at the house, "[p]eople were hanging out and drinking." Cullins confirmed that Crum locked the door while the group was outside on the patio. Cullins stated that she never saw Cowling attempt to open the door,[18] but that she did see him knock on the door. According to Cullins, at that time, there was no movement or lights on inside the house.

---

[16]The State introduced, and the trial court admitted, the recording of Horton's 9-1-1 call.

[17]Cullins said Wilson stayed at Crum's house for about one hour and left.

[18]Cullins also said she did not recall telling the district attorney that she had seen Cowling try to open the door.

9

Cullins believed Cowling knocked on the glass door more than five times.[19] When asked if Cowling was yelling, Cullins stated, "I would say his voice was raised but not yelling." Cullins testified that, when Cowling arrived at Crum's house that night, Cowling was carrying a beer and was "very smiley" and "in a good mood."[20]

In addition, Cullins explained that she did not see the glass door break, but that she saw Crum standing in the doorway with the gun, "so he was halfway out." Cullins stated that, when Crum was in the doorway, pointing the gun, he said, "Get back." She did not see Crum and Cowling have an altercation. According to Cullins, Brantley and Johnson were trying to restrain Crum in order to get the gun away from him, but she did not recall what Cowling was doing during that time. Cullins heard the shot fired and saw Cowling fall. Cullins ran to Brantley's truck and contacted 9-1-1 while traveling away from Crum's house. After arriving at her mother's home, Cullins and Johnson prepared a written statement at the request of the police officers. Brantley, however, did not. According to Cullins, she told Brantley that he needed to write a statement "to justify this." Cullins said, "That's how I feel, that it was wrong, what we just saw."

Crum testified that, when he graduated from high school, he joined the Marine Corps. Crum said that, during his time in the Marines, he was trained to remain calm in very stressful situations. After training, Crum deployed to a combat zone in Afghanistan. While there, Crum worked as a radio operator, stood guard at the gates of the base, and worked with detainees. Crum said that, while in Afghanistan, he never discharged his weapon, engaged the enemy, or physically

---

[19]Cullins explained that Cowling was asking Crum to open the door because Cullins needed to get her purse.

[20]Shortly after the incident, however, Cullins had described Cowling as being "sketzy," meaning "[h]yper."

attacked anybody. At the end of four years, Crum left the military. He then went to school, eventually becoming a licensed physical therapist assistant in Sulphur Springs. Crum stated that, in order to have a life outside of his work, he began going to local bars.

Crum said that, the day before the incident, he worked, took care of his dogs, and went to the gym. Johnson and Brantley asked Crum to go to the bar later that evening. Crum took an Uber to the bar, arriving sometime around ten or ten thirty. There, Crum met Brantley and Johnson. They had drinks, and Brantley and Crum talked about going to Crum's house to continue drinking and socializing. According to Crum, he was expecting only Brantley and Johnson to join him at his house. He did not, however, have an issue with others coming to his house, "as long as there [were] no drugs."

Crum invited Johnson to ride in the Uber with him so that he would not have to ride with someone who had been drinking. When Crum and Johnson arrived at the house, they cleaned "a little bit . . . [because he] didn't want people seeing that [he] had a messy house." Eventually, between eight and ten people arrived at the house. Crum stated that he talked to Sanders and that they ended up playing beer pong as a team. He conceded that he pursued Sanders, telling her she was pretty. Crum stated, "I was flirting with her. She was flirting back." He said that Sanders told him that "she had a guy," and so Crum "left it at that." Crum said it was around that time that Taylor interrupted them.

According to Crum, around 3:15 a.m., the first group of individuals began to leave his house, and Crum was "pretty happy" to see them leave. Crum stated, "The guy named [Taylor] was being obnoxious. You could tell he was excessively drunk. He kept coming in between

11

Sanders and I, and just kept doing it even though I told him okay." Crum continued, "And he was being really obnoxious, and I was ready for him to leave, and then eventually I was ready for everybody to leave." Crum said Taylor was "causing troubles and getting in [his] face, and [Crum] didn't want to have any sort of issues with anyone."

According to Crum, after the first group left, Cullins, Horton, Brantley, and Johnson tried to talk him into letting them stay longer so they could continue drinking and playing games. Crum said he did not want them to stay, so he eventually "got them out of [his] house and shut and locked the door." After shutting the door, Crum turned off the music. He did not recall whether he turned off the lights. Crum said, "I was tired and I was ready to go to bed and was done with dealing with all that stuff that evening." Crum let his dogs out of their kennels and went into his bedroom.

Crum explained that he had a Glock 9mm pistol in his bedroom. While Crum was in his bedroom, Brantley and Horton sent him text messages, letting him know that they had left some of their belongings in the house. Crum said, "I didn't want to deal with it, so I put my phone on my bed and go back to tending to the dogs." Crum stated that, by that time, he was agitated and upset. Regardless, Crum continued to hear his telephone buzz and guessed someone was trying to call him. However, he did not answer his phone. Crum then heard a male voice yelling his name, but he did not recognize the voice. He was aware that people were still on his patio, because his bedroom was right next to it, and he could hear them. Crum stated that it seemed to him that they were upset, but he continued to believe that it would be "better to deal with it another day."

According to Crum, he then heard the glass break loudly. He stated that he believed someone was attempting to break into his home so that they could "come after [him]." Crum stated

12

that he went to his dresser, grabbed his gun out of its holster, walked out of his bedroom down the hallway, and then saw the glass "all over the floor." Crum said there was "a guy" standing outside of the door, but that he did not recognize him or remember having met him. He conceded, however, that it was possible that he had met him, but that he did not remember.

Crum testified that the gun was shoulder height, horizontal to the ground, and that he pointed it at the person and told him in a stern manner, "I'm telling you to get back." Crum said that the individual refused to comply with his instructions. Crum then placed the gun on the television stand[21] so that he could unlock the door and get the individual off of his property. According to Crum, it was then that the person "forced" his way into the home. Crum explained, "And I start fighting him back and push him out. And when I get him out, I see Brantley and Johnson to the right of me, and they jump in." Crum stated that, as the fight continued on the patio, he felt his right shoulder slam into a wall, and then someone began hitting him in the head repeatedly. "Then they're holding me against the wall and someone starts hitting me in the head over and over and over, and I put my hands up like this, duck down."

Next, Crum stated he tried to push off the wall so that he could go get his gun. He stated that he had "no idea what's going on behind [him]" and that he just went back through the door to "grab" his gun. When asked what happened next, Crum explained, "I knew that I had to make sure there was a round in the chamber, so I grab the slide back." Crum then "tried to get a visual," and, as he was turning, he saw "where the guy [was]." Crum stated that he saw the individual "coming after [him]," so he raised and fired the gun. He said he believed that the individual was

---

[21]Crum stated that the officers located his gun on the television stand, where he had left it.

coming into his house, that he felt his life was in danger, and that he "knew that if [he] didn't take some sort of action that [his] life was going to be -- something was going to happen to [him]." He also explained that he was in a "crouched-down staggered defensive position" because when "someone is going to attack you, you want to be able to defend yourself."

Crum said that he shot Cowling because he believed it was his only option in order to save his own life. Crum continued, "Once I fired the shot, I knew that the situation was under control, and I looked around to see if anybody else was there." While doing so, he continued to keep his weapon "pointed." Knowing that the police would soon be arriving, Crum set his gun back down on the television stand and went to put his dogs in the kennel. After he finished taking care of his dogs, he heard Horton say that Cowling was still breathing, so he began to do CPR on him and continued doing it until the police arrived.[22]

At trial, Crum argued that he was acting in sudden passion and in self-defense when he shot Cowling.

Crum asserts that the evidence was legally insufficient to rebut the affirmative defense of self-defense. He states, "[N]ot only had [his] house been broken into, [Crum] was assaulted by three men reaching for his gun, and when [Crum] retreated inside his home, [Cowling] continued going towards [him] despite the fact that [Crum] had a gun and was pointing it at him for the second time." According to Crum, these factors show that the State failed to satisfy its burden of persuasion in rebutting his claim of self-defense.

_____

[22]Crum stated that he wanted to save Cowling's life.

14

The use of deadly force is a defense to prosecution for murder if the use of deadly force is justified. TEX. PENAL CODE ANN. §§ 9.02, 9.31–.32. "[A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE ANN. § 9.31(a). However, "[t]he use of force . . . is not justified . . . in response to verbal provocation alone," or "if the actor provoked the other's use or attempted use of unlawful force." TEX. PENAL CODE ANN. § 9.31(b). Further, a person's use of *deadly force* against another is justified if use of force would be justified under Section 9.31 and "when and to the degree the actor reasonably believes the deadly force is immediately necessary . . . to protect the actor against the other's use or attempted use of unlawful deadly force."[23] TEX. PENAL CODE ANN. § 9.32(a)(2)(A). "Reasonable belief" is defined as "a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." TEX. PENAL CODE ANN. § 1.07(a)(42) (Supp.).

Under certain circumstances, the actor's belief that deadly force was immediately necessary is presumed to be reasonable. One of these circumstances is when (1) the actor "knew or had reason to believe that the person against whom the deadly force was used" was committing or attempting to commit certain enumerated offenses, (2) the actor did not provoke the other person, and (3) the actor was not engaged in criminal activity, other than a Class C misdemeanor or a traffic violation. TEX. PENAL CODE ANN. § 9.32(b). In addition, an actor is not required to retreat before using deadly force if "[he] has a right to be present at the location where the deadly

---

[23]A person may also use deadly force "when and to the degree the actor reasonably believes the deadly force is immediately necessary . . . to prevent the other's imminent commission of" certain enumerated offenses, including aggravated kidnapping, aggravated robbery, and murder. TEX. PENAL CODE ANN. § 9.32(a)(2)(B).

force is used, and [he] is not engaged in criminal activity at the time deadly force is used." TEX.

PENAL CODE ANN. § 9.32(c).

In evaluating a claim of insufficient evidence in the context of a self-defense issue, we apply the general sufficiency review principles,[24] in conjunction with sufficiency review principles specific to self-defense. *See Braughton v. State*, 569 S.W.3d 592, 609 (Tex. Crim. App. 2018). When there is a claim of self-defense or defense of a third person to justify use of force or deadly force against another, "the defendant bears the burden to produce evidence supporting the defense, while the State bears the burden of persuasion to disprove the raised issues." *Id*. at 608 (citing *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Saxton v. State*, 804 S.W.2d 910,

---

[24]In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). In drawing reasonable inferences, the jury "may use common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life." *Duren v. State*, 87 S.W.3d 719, 724 (Tex. App.—Texarkana 2002, pet. struck) (citing *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) (Meyers, J., concurring)). The jury is also the sole judge of the credibility of the witnesses and the weight to be given their testimony and may "believe all of a witnesses' [sic] testimony, portions of it, or none of it." *Thomas v. State*, 444 S.W.3d 4, 10 (Tex. Crim. App. 2014). We give "almost complete deference to a jury's decision when that decision is based upon an evaluation of credibility." *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008).

In our review, we consider "events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Hooper*, 214 S.W.3d at 13 (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)). It is not required that each fact "point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id*. Circumstantial evidence and direct evidence are equally probative in establishing the guilt of a defendant, and guilt can be established by circumstantial evidence alone. *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13 (citing *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)). Further, "we must consider all of the evidence admitted at trial, even if that evidence was improperly admitted." *Fowler v. State*, 517 S.W.3d 167, 176 (Tex. App.—Texarkana 2017), *rev'd in part by* 544 S.W.3d 844 (Tex. Crim. App. 2018) (citing *Moff v. State*, 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004)).

913–14 (Tex. Crim. App. 1991)). The defendant is required to produce "some evidence that would support a rational finding in his favor on the defensive issue." *Id*. (citing *Krajcovic v. State*, 393 S.W.3d 282, 286 (Tex. Crim. App. 2013)). The State is not required to produce evidence; rather, its burden of persuasion only requires "that the State prove its case beyond a reasonable doubt." *Id*. (quoting *Zuliani*, 97 S.W.3d at 594) (citing *Saxton*, 804 S.W.2d at 913)). Therefore,

> [i]n resolving the sufficiency of the evidence issue, we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of murder beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt.

*Id*. at 609 (quoting *Saxton*, 804 S.W.2d at 914). Further, as with the general sufficiency principles, the trier of fact is the sole judge of the credibility of defensive evidence, and it is free to accept it or reject it. *Id*. (citing *Saxton*, 804 S.W.2d at 914). Self-defense is a fact issue that is determined by the jury, and "[a] jury verdict of guilty is an implicit finding rejecting the defendant's self-defense theory." *Id*. (quoting *Saxton*, 804 S.W.2d at 914).

Here, Crum relies heavily on his own testimony, and that of his expert, to support his contention that he acted in self-defense. Contrary to his testimony, however, multiple witnesses testified that Crum was acting in an unusual manner the evening of the incident and that Crum, not Cowling, was the aggressor during the incident. The jury, as the trier of fact, is the sole judge of the credibility of the witnesses and the weight given to the evidence. *Fuentes v. State*, 991 S.W.2d 267, 271 (Tex. Crim. App. 1999). When faced with a record that supports conflicting inferences, we presume the trier of fact resolved the conflict in support of the verdict. *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).

Based on the evidence, the jury could have concluded that a reasonable person in Crum's circumstances would not have believed that the use of deadly force was necessary to prevent the use of deadly force against him. *See* TEX. PENAL CODE ANN. § 9.32(a). Further, the jury could have reasonably believed that Crum did not have any "reason to believe" that Cowling "unlawfully and with force entered, or was attempting to enter unlawfully and with force" Crum's home at the time Crum shot him. *See* TEX. PENAL CODE ANN. § 9.32(b). The jury could have also reasonably believed that, when Crum shot Cowling, Crum was in the process of committing theft of the guests' belongings inside his house and, thus, was then involved in criminal activity.[25] *See* TEX. PENAL CODE ANN. § 9.32(b).

When this record is viewed in the light most favorable to the jury's verdict, we find that a rational jury could have found beyond a reasonable doubt that Crum committed murder and, in making that finding, could have found against Crum beyond a reasonable doubt on his claim of self-defense. *See Saxton*, 804 S.W.2d at 914. Consequently, we find that legally sufficient evidence supported the jury's rejection of Crum's self-defense claim.

We overrule this point of error.

### *(2)    Admitting Blood-Spatter Testimony Was Harmless Error*

Crum contends the trial court reversibly erred by admitting expert testimony on blood-spatter evidence from Texas Ranger John Vance. According to Crum, "[T]he State presented no evidence that Vance's expert testimony . . . was relevant and reliable under the third prong of *Kelly*,

---

[25]For more on that possibility, see our discussion of Crum's claims of charge error, below.

that the technique was properly applied on the occasion in question." *See Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992).

During Vance's direct testimony, Crum asked the trial court for a hearing outside the jury's presence to rule on Vance's qualifications to render "any type of expert opinion."[26] A discussion was then had between the court and the parties regarding whose burden it was to qualify the witness during a Rule 705(b) hearing. Crum stated that he believed it was the State's burden to ask Vance questions.[27] The State responded that it had provided Crum with both pretrial notice of its intent to call Vance and Vance's curriculum vitae showing Vance's training, qualifications, and experience. The State said, "That has been provided to the defense, and I believe under 705(b), this is their opportunity to voir dire the witness as to his qualifications." The trial court told the defense counsel, "The witness is yours, . . . if you have some questions; otherwise, I'm going to bring the jury down."

Defense counsel then asked Vance several questions regarding his qualifications as an expert in blood-spatter analysis. The State followed with a few questions of its own, including whether Vance believed his testimony regarding blood-spatter analysis would assist the jury in understanding the evidence. Vance stated that he believed it would. The trial court then asked Crum if he had any objections to Vance testifying as an expert in blood-spatter evidence, to which Crum responded:

---

[26]The State provided Crum with pretrial notice that it would be calling Vance as an expert in blood-spatter analysis. Crum did not seek a pretrial *Kelly* hearing.

[27]Defense counsel stated, "I believe the State, if they're going to offer expert testimony, has to qualify that witness and -- and what that witness is doing."

> I would object to any testimony with regards to any expert opinion regarding blood spatter provided by this witness. The State has not proven the scientific reliability of the blood spatter testimony that they intend to apply. They . . . didn't give us any type of understanding about how to properly apply this scientific training -- or scientific analysis of the blood spatter, and they've not been able to provide that it has been properly applied in this particular case, your Honor.[28]
>
> I don't believe that this witness is qualified to do that and they haven't met the scientific reliability for admissibility of expert scientific testimony regarding blood spatter.

The trial court then asked Crum whether he was objecting to the science of blood spatter or Vance's ability to testify about blood spatter. Crum answered, "Both."[29] The court overruled Crum's objections, and the State proceeded with its case.

"Before an expert states an opinion or discloses the underlying facts or data, an adverse party in a civil case may—or in a criminal case must—be permitted to examine the expert *about the underlying facts or data*. This examination must take place outside the jury's hearing." TEX. R. EVID. 705(b) (emphasis added). The record shows the trial court determined that the hearing was conducted pursuant to Rule 705(b) of the Texas Rules of Evidence.

Yet, Crum maintains that the trial court erred when it admitted Vance's testimony concerning blood-spatter analysis without conducting a hearing outside the presence of the jury, requiring the State to show that the blood-spatter evidence was relevant[30] and reliable under the standards announced in *Kelly*. We agree.

---

[28]*See Kelly*, 824 S.W.2d at 573 (indicating that for expert testimony to be reliable the underlying scientific theory must be valid, the technique applying the theory must be valid, and the technique must have been correctly applied on the occasion in question).

[29]Crum asked for, and was allowed to make, a running objection in regard to Vance's expert testimony.

[30]To the extent Crum contends, on appeal, that Vance's testimony regarding blood spatter was not relevant, he has waived that issue for our review.

Under the particular circumstances at issue, the applicable rule was Rule 702, as Crum contends, and not Rule 705(b), as the State claims. "If scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," "a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX. R. EVID. 702. Pursuant to Rule 702, before admitting expert testimony, the trial court must be satisfied that (1) the witness qualifies as an expert by reason of knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is appropriate for expert testimony; and (3) admitting testimony will assist the fact-finder in deciding the case. *Alvarado v. State*, 912 S.W.2d 199, 215–16 (Tex. Crim. App. 1995). The proponent of the expert testimony bears the burden of proving the expert's qualifications. *Taylor v. State*, 268 S.W.3d 571, 578–79 (Tex. Crim. App. 2008). Here, the State failed to meet its burden; as a result, admitting Vance's testimony as an expert in blood-spatter analysis was error.

The qualifications of an expert witness, however, are distinct from the reliability and relevance of his testimony, and therefore, they must be evaluated independently.[31] *Vela v. State*, 209 S.W.3d 128, 131 (Tex. 2006). The proponent of the expert testimony bears the burden of proving the expert's qualifications. *Perez v. State*, 113 S.W.3d 819, 832 (Tex. App.—Austin 2003, pet. ref'd).

While an expert's qualifications deal with his background and experience, reliability focuses on the subject matter of the witness' testimony. *Id*. In *Kelly*, the court explained that

---

[31]The record shows that Vance qualified by reason of his experience and training to testify on blood spatter evidence. Likewise, Vance's testimony was relevant to the subject matter of the case.

scientific evidence must meet three criteria in order to be considered reliable. The reliability factors are: "(a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly applied on the occasion in question." *Vela*, 209 S.W.3d at 133–34 (quoting *Kelly*, 824 S.W.2d at 573). The court outlined a list of non-exclusive factors that could affect a trial court's determination regarding reliability:

> (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the experts testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person(s) who applied the technique on the occasion in question.

*Id*. "And even if the traditional *Kelly* reliability factors do not perfectly apply to particular testimony, *the proponent* is not excused from proving its reliability." *Vela*, 209 S.W.3d at 134. Here, the State failed to prove that Vance's testimony was reliable.

Yet, the State contends that many courts have taken judicial notice that an expert's testimony on blood spatter was reliable and, as such, the trial court did not err in allowing Vance to testify without requiring the State to first prove his testimony was reliable. In *Vela*, the Texas Court of Criminal Appeals addressed a similar argument:

> In this case, the court of appeals asserted that if "a particular type of scientific evidence is well established as reliable," *the proponent* may avoid the burden of producing supportive evidence by asking that the trial court take judicial notice. And the court [of appeals] claimed that "[c]learly, medical testimony in sexual assault cases, whether by a nurse, sexual assault examiner, or physician, is the type of scientific evidence that is well established as reliable." The court of appeals, therefore, failed to make an inquiry into the reliability of [the expert]'s theory. Instead, the court of appeals deemed [the expert] qualified to testify as an expert

22

and then simply asserted that the trial court erred in excluding her testimony because medical testimony is "well established as reliable."

*Id*. at 135 (citations omitted). Therefore, in accordance with *Vela*, the trial court erred when it allowed Vance to testify as an expert in blood-spatter evidence without first requiring the State, as the proponent of the evidence, to prove the reliability of his testimony.

We must next determine whether admitting Vance's testimony was harmful. Any error, other than constitutional error, that does not affect the "substantial rights" of the appellant must be disregarded. TEX. R. APP. P. 44.2(b). The erroneous admission of evidence is not considered constitutional error. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). Such harm has not occurred "if the appellate court, after examining the record as a whole, has a fair assurance that the error did not influence the jury, or had but a slight effect." *Id*. Therefore, we must determine whether the error had a substantial or injurious effect on the jury's verdict. *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000).

To determine whether the trial court's error influenced the jury, we consider

(1) the source of the error, (2) the nature of the error, (3) whether or to what extent it was emphasized by the State, (4) the probable collateral consequences of the error, (5) how much weight the jurors probably placed on the error, and (6) whether declaring the error harmless would encourage the State to repeat it with impunity.

*Garza v. State*, 963 S.W.2d 926, 930 (Tex. App.—San Antonio 1998, no pet.).

Here, the State was the source of the error. After giving his background and qualifications,[32] Vance testified that, on the morning of February 24, 2018, he was called to the

---

[32]According to Vance, he was employed by the Texas Department of Public Safety, assigned to the Texas Ranger Division. Vance stated that he had worked in law enforcement for twenty-eight years. Regarding his training in blood-spatter analysis, Vance explained that he had gone to a series of schools to learn how to investigate major crime scenes, one of which was a school that focused on blood spatter. After completing the basic training courses, he was

23

scene of the shooting. The majority of Vance's testimony related to the investigation of the scene and giving descriptions of photographs he had taken during his investigation, including the interior and exterior of the house, blood spatter on the walls and floors of the inside and the outside of the house, the broken glass door and the track of the door, various shots of Cowling, an unspent 9mm cartridge, a spent 9mm casing, and a narcotics pipe found in the pocket of Cowling's pants.

Thus, much of Vance's testimony dealt with evidence that did not relate directly to blood-spatter analysis. Moreover, Crum presented his own expert on blood-spatter evidence to counter Vance's testimony.[33] Further, the photographs of the scene, including the blood spatter, were admitted into evidence for the jury to review on its own.

---

required to attend continuing education classes, where he was "trained under different people in the field who [were] extremely knowledgeable about the -- blood spatter, along with many, many other areas that [he] train[ed] under." Vance stated that, as a Texas Ranger, he had trained people in multiple states on crime scene reconstruction, "all which has something to do with blood spatter." Vance also said he had testified in other cases as an expert in blood-spatter evidence.

[33]To controvert Vance's testimony, Crum presented his own expert on blood-spatter analysis, Tom Bevel. Bevel had taken courses in forensic science and forensic analysis in, among other places, London, England, at the London Medical College, and through the Federal Bureau of Investigation. In the specific area of bloodstain pattern analysis, he had completed, among other courses, three basic forty-hour courses and two advanced forty-hour courses. In total, Bevel had accrued about forty-six years of experience in the area of the analysis of blood-spatter evidence. Bevel stated that he had been previously qualified as an expert in other cases in a number of different forensic areas.

At trial, Bevel first explained, at great length, the different types of blood spatter and that the spatter depended on the type of force that it had experienced. Bevel testified that, after looking at the crime scene photographs, he determined that there were "a number of things" that could have been done differently in this case. Bevel stated, "There are certainly some best practices that were not done in this particular case, especially when we're looking at the bloodstain pattern analysis." Bevel then explained what some of those "best practices" were.

To support Crum's self-defense claims, Bevel testified, among other things, that some of the blood found inside Crum's house had to have gotten there by one of two ways: (1) Cowling's hand went through the glass and stayed in the glass long enough to pool blood and drip and move side-to-side; or (2) Cowling's hand went through the glass, he pulled it out, and at some point, put his hand back inside and moved it side-to-side long enough to cause the drips. Bevel also testified that, if Cowling was the only active bleeder at the scene, the blood drops found near the television stand inside the house meant that Cowling's hand was above the area where the drops were found. In sum, Bevel concluded that the best explanation to account for Cowling's blood being inside Crum's home was that Cowling was inside the home at some point after cutting his wrist.

24

As to the blood-spatter evidence, Vance gave a description of "passive" blood drops and "low velocity" blood spatter. He then went through a series of photographs of the scene, explaining what he believed to be passive blood drops or low velocity blood drops, both on the patio and on the inside of Crum's home. Crum complains of Vance's testimony that, (1) because there was blood spatter on the glass and the wall, it was reasonable to have blood land inside the house without the injured person physically being inside the house; (2) the drops of blood inside the house that led to the television stand did not necessarily mean that the bleeding person had been inside the house; and (3) if Cowling had been inside the house, there would have been more blood on the interior of the home.

The record strongly suggests that the jury did not need Vance's opinion of the blood-spatter evidence to draw its own conclusions and reject Crum's self-defense claim. The documentary evidence—the photographs of the blood spatter found inside and outside the house and testimony from witnesses that Cowling did not go into Crum's house or act as the aggressor during the incident—stood against his claim of self-defense. Likewise, the jury could have considered, as additional refutation of self-defense, testimony from multiple witnesses that Crum was already in an anxious or angry mood before the shooting. Moreover, the testimony that Crum re-entered his home to retrieve the gun a second time, then walked back to the door and pointed the gun directly at Cowling, was evidence the jury could have considered when it found against Crum's claim of self-defense.

The State's denial of error may suggest that the same type of error might be repeated. However, the record reflects that the State was genuinely convinced that the hearing was to be

25

conducted pursuant to Rule 705(b), and not 702. The trial court agreed with the State. Although it was an improper conclusion, we find nothing in the record to convince us that the State would be encouraged to repeat its error under similar circumstances.

We conclude that the error did not affect the jury's verdict and that Crum's substantial rights were not adversely affected. Accordingly, we overrule this point of error.

*(3)        Admitting Evidence Suggesting Crum's Aggressiveness Was Not an Abuse of Discretion*

Crum contends the trial court erred when, over his objections, it admitted evidence that (a) he had been diagnosed with social anxiety disorder, (b) he had been controlling and physically violent toward his former wife, Cassandra Allen,[34] (c) he had been controlling and physically violent toward his former wife, Kelly Hayes,[35] (d) he had been required to attend substance abuse counseling, (e) he had attended anger management classes while married to Allen, and (f) there had been a military protective order entered against him in 2013 and (g) he was required to surrender his military-issued weapons custody card.

The trial court allowed Crum to make a running objection to the complained-of evidence, recognizing his claims that its admission violated Rules 401, 403, and 404(b) of the Texas Rules of Evidence. *See* TEX. R. EVID. 401, 403, 404(b). The trial court overruled his objections, finding that the evidence was admissible "to prove intent, to rebut a theory of self-defense, and to rebut the impression presented to the jury regarding essentially [Crum]'s calmness under stressful situations. . . ." We agree.

---

[34]Crum was alleged to have been violent with Allen at the Marine Corps Ball by punching the wall and kicking the furniture.

[35]Crum was alleged to have slapped, shoved, and briefly choked Hayes.

26

We review for an abuse of discretion a trial court's decision to admit or exclude evidence. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). Abuse of discretion occurs only if the decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Taylor*, 268 S.W.3d at 579; *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g). We may not substitute our own decision for that of the trial court. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). We will uphold an evidentiary ruling if it was correct under any theory of law applicable to the case. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

Crum contends that evidence regarding his social anxiety disorder, with which he had been diagnosed while serving in the military, was not relevant because he did not continue treatment for the disorder after he left the military. Evidence is relevant if it tends to make the existence of any fact of consequence more or less probable than it would be without the evidence. TEX. R. EVID. 401. While relevant evidence is generally admissible, evidence that is not relevant is inadmissible. TEX. R. EVID 402. In some instances, "[e]vidence that is otherwise inadmissible may be admissible when a party opens the door to such evidence." *Hayden v. State*, 296 S.W.3d 549, 554 (Tex. Crim. App. 2009) (citing *Renteria v. State*, 206 S.W.3d 689, 697–98 (Tex. Crim. App. 2006)). "A party opens the door by leaving a false impression with the jury that invites the other to respond." *Id*. (citing *Daggett v. State*, 187 S.W.3d 444, 452 (Tex. Crim. App. 2005)).

During direct examination, Crum testified about his ability to remain calm in stressful situations, which, he said, was due to the training he received in the military. On cross-examination, and over a running objection, Crum conceded that he had been diagnosed with social

anxiety disorder before he had been deployed to Afghanistan. He also agreed that the disorder caused him to be irritable and frustrated.

When Crum testified that he had been trained by the military to act calmly in stressful situations, he invited the State to offer evidence to the contrary, that is, that he had been diagnosed with a disorder that caused him to behave in a fashion contrary to what he had claimed and that Crum, and not Cowling, was the aggressor during the incident. Whether he was actually receiving treatment for the disorder at the time of the shooting is of little consequence. Crum was also not receiving stress-related training from the military at the time of the incident, yet he chose to offer the evidence in support of his defense. Thus, the trial court's admission of the State's evidence relating to his anxiety disorder and his erratic behavior during stressful situations was not in error.

Crum contends evidence of extraneous bad acts relating to his alleged violent behavior, and the resulting consequences of that behavior, was not probative apart from proving character conformity. Specifically, Crum contends the complained-of evidence was extremely inflammatory because it portrayed him as a "wife beater."

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. TEX. R. EVID. 404(b). However, evidence of "other crimes, wrongs or acts" may be admissible if it has relevance apart from its tendency "to prove the character of a person in order to show action in conformity therewith." *Id.* The permissible "purposes" to which evidence of "crimes, wrongs or acts" may be put include "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* Evidence of extraneous bad acts that logically serves any of these purposes is

28

"relevant" beyond its tendency "to prove the character of a person in order to show action in conformity therewith," provided its probative value substantially outweighs the danger of unfair prejudice. TEX. R. EVID. 403, 404(b).

Of course, an accused must be tried only for the offense with which he is charged. He may not be tried for a collateral crime or for being a criminal or bad person generally. *Stafford v. State*, 813 S.W.2d 503, 506 (Tex. Crim. App. 1991).

> Generally, evidence of extraneous offenses may not be used against the accused in a criminal trial. While such evidence will almost always have probative value, it forces the defendant to defend himself against uncharged crimes as well as the charged offense, and encourages the jury to convict a defendant based on his bad character, rather than proof of the specific crime charged.

*Daggett v. State*, 187 S.W.3d 444, 450–51 (Tex. Crim. App. 2005) (footnotes omitted). "Rule 404(b) sets out an illustrative, not exhaustive, list of exceptions to the prohibition against admitting evidence of extraneous offenses . . . ." *Id.* at 451 n.13 (citing TEX. R. EVID. 404(b)).

In support of his position that the trial court erred when it admitted the complained-of evidence, Crum directs us to *Kiser v. State*, 893 S.W.2d 277, 284 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd). In that case, evidence that Kiser choked his former wife on the evening before an aggravated sexual assault on a friend was deemed erroneously admitted. *Id.* Kiser maintained that, while it was arguable that the substance of the argument between him and his wife the previous night might have had some bearing on the intent or motive to rape the victim the following evening, the testimony concerning the physical act of grabbing, beating, or choking his ex-wife had no such relevance. *Id.* at 281. The State claimed the evidence was primarily admissible to prove identity of the person who choked and sexually assaulted the victim. *Id.*

29

The court of appeals disagreed with the State, stating, "To assess the probative value, if any, that extraneous offense evidence has apart from its tendency to prove character conformity," an appellate court looks to the following factors: "(1) the availability of alternative sources of proof, and more generally the State's need for the evidence; (2) the closeness in time between the extraneous offense and the charged offense; and (3) the similarities between the extraneous-offense and the charged offense." *Id*. at 281–82.[36] After applying the three factors, the appellate court determined that admitting the extraneous choking incident was error. *Id.* at 283.

Unlike our analysis here, in *Kiser*, the appellate court was primarily discussing the three applicable factors as they related to the State's chief contention that the extraneous-offense evidence should be admitted for the purpose of proving identity. *Id.* at 281. In this case, identity was not an issue. There was no question that Crum shot Cowling. Instead, the issue centered squarely on which party was the aggressor and whether Crum was justified in shooting Cowling in self-defense.

At trial, Crum admitted to an incident in California when he had slapped and choked his then-wife. When an accused claims self-defense, as did Crum, the State may show the accused's intent by showing other violent acts in which the accused was the aggressor. *See Halliburton v. State*, 528 S.W.2d 216, 218–19 (Tex. Crim. App. 1975); *see also Johnson v. State*, 963 S.W.2d 140, 144 (Tex. App.—Texarkana 1998, pet. ref'd). As a result, the State was free to introduce evidence that demonstrated prior violent episodes in which Crum acted as the aggressor. Likewise,

---

[36]In its final analysis, the appellate court determined that the improperly admitted extraneous-offense evidence did not harm Kiser. *Kiser*, 893 S.W.2d at 285.

the State was free to introduce evidence that Crum had been diagnosed with a disorder that caused him to become frustrated and irritable when things did not go as he believed they should, such as becoming angry when his guests did not leave his home when he wanted and when his glass door was shattered. Thus, evidence of Crum's prior aggressive behavior, as well as its resulting consequences, was relevant to support the State's theory that Crum intentionally shot Cowling due to anger issues and not, as he claimed, in self-defense.

In addition, Crum maintains that, even assuming the evidence of extraneous bad acts was relevant either to rebut a defensive theory or to provide the jury with contextual evidence, the trial court should have excluded it because the probative value of the evidence was substantially outweighed by the danger of unfair prejudice.

In deciding whether to admit evidence of a defendant's prior bad acts, trial courts are permitted wide discretion in deciding whether the evidence serves a legitimate purpose other than as character evidence and to exclude or admit misconduct evidence; thus, if the trial court decides such issues within its discretion, we should not disturb its decision. *Montgomery*, 810 S.W.2d at 390 (op. on reh'g).

Under a Rule 403 analysis, courts should balance the following factors: (a) the strength of the evidence in making a fact more or less probable, (b) the potential of the evidence of extraneous bad acts to impress the jury in some irrational but indelible manner, (c) the amount of time the proponent needed to develop the evidence, and (d) the strength of the proponent's need for this evidence to prove a fact of consequence. *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999).

31

The first factor, probative value, weighs in favor of admission. The State charged Crum with intentionally killing Cowling, and Crum claimed he acted in self-defense because he was in fear for his life. The complained-of evidence was necessary in order to support the State's theory that Crum was not acting in self-defense when he shot Cowling. It was also highly probative to show that, despite Crum's assertions, he did not always act in a peaceful manner under stressful situations.

The second factor, the potential to give the jury an irrational and indelible impression, inquires as to the evidence's tendency to tempt the jury into finding guilt on grounds apart from proof of the offense charged. *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005). Notably, the potential prejudice of nearly identical acts is very high because it is stark proof of criminal character or propensity to act in a specific manner under like circumstances. *Park v. State*, 746 S.W.2d 738, 739 (Tex. Crim. App. 1987).

In this case, the prior bad acts of aggressive behavior related mainly to Crum's aggression during stressful domestic situations, and not when encountering friends or acquaintances during a party. Moreover, giving a limiting instruction to the jury is a factor to consider in determining whether the jury improperly considered the extraneous bad acts. *Owens v. State*, 827 S.W.2d 911, 916–17 (Tex. Crim. App. 1992). Here, the trial court instructed the jury, both orally and in its jury charge, that it was to consider the evidence of extraneous bad acts for limited purposes.[37] We therefore find that this factor weighs in favor of admission.

---

[37]In its jury charge, the trial court instructed the jury as follows:

> During trial, you heard evidence that the defendant may have committed wrongful acts not charged in the indictment. The State offered the evidence to show the defendant's intent, to rebut

The time spent developing the evidence of extraneous bad acts, the third factor, was not unduly lengthy. In support of his position to the contrary, Crum points to the evidence presented by the State at trial and the following specific portions of its closing argument:

> They didn't know . . . that the 27-year-old fisherman on the weekends, single guy had been married twice.
> Listen to me. Had been violent with both of them.
> Listen to me. Diagnosed uncontrollable outbursts of anger with alcohol. This is his nature.
> Think of the old country song, it was bound to happen, and one night it did. You didn't know, and he didn't want you to know that this clean-shaven young man, actually because of alcohol -- listen to me -- because of alcohol and being violent and how those two interact with his social anxiety disorder, that he had to be separated from his wife; that the military said, give us your gun; that the military said, you can't live with your wife; that the military said, you've got to go take a 16-week anger management and you've got to go do a two-week course on alcohol. He didn't want you to know that.
>
> . . . .
>
> He wasn't thinking about the fact that this jury would know of [his] tendencies to violence and how that's intensified with alcohol.

Again, when we take into consideration that Crum asserted that he had been militarily trained to remain calm under pressure, and that he acted not as an aggressor but, rather, in self-defense, the

---

the theory of self-defense, and to rebut the impression presented to the jury during the defendant's direct examination. You are not to consider that evidence at all unless you find, beyond a reasonable doubt, that the defendant did, in fact, commit the wrongful act or acts. Those of you who believe the defendant did the wrongful act or acts may consider it.

Even if you do find that the defendant committed a wrongful act, you may consider this evidence only for the limited purposes I have described. You may not consider this evidence to prove that the defendant is a bad person and for this reason was likely to commit the charged offense. In other words, you should consider this evidence only for the specific, limited purpose I have described. To consider this evidence for any other purpose would be improper.

Moreover, prior to admitting the complained-of testimony, the trial court orally instructed the jury in a similar fashion.

State did not require an inordinate amount of time to develop the complained-of evidence and did not cause undue delay in the five-day murder trial.

The fourth factor, the State's need for the evidence of Crum's extraneous bad acts to prove a fact of consequence, also weighs in favor of admission. The State sought to rebut Crum's assertion of his ability to remain calm under stress, and his claim of self-defense, by showing that his behavior in the past during stressful situations led to aggressive behavior and not, as he claimed, calm, rational thinking. The question of Crum's behavior is directly related to his intentions when he shot Cowling, that is, was he acting in self-defense or as the aggressor. Thus, we find the State had a significant need for the admission of the complained-of evidence.

Considering all four factors together, we conclude the trial court acted within its discretion in deciding that the probative value of the evidence of extraneous bad acts was not substantially outweighed by its prejudicial impact. Consequently, we overrule this contention.

*(4)     Limiting Impeachment Cross-Examination of Horton Was Not Error*

Crum contends the trial court erred by limiting his cross-examination of Horton and by excluding from evidence text messages between Horton and Cowling.[38] Specifically, Crum states that, during Horton's direct testimony, while describing some of the events that took place at Crum's house, Horton explained that she joined in a drinking game referred to as "flip cup" and that she had never played the game before that evening. The State then asked Horton if she smoked

---

[38]Outside the presence of the jury, Crum questioned Horton about a series of text messages she sent to Cowling inquiring as to whether he had "$40 worth to get rid of," referring to marihuana. Horton explained to Cowling in her text message that she was inquiring about the purchase on Brantley's behalf. In response, Cowling texted that he "just got rid of the last." Horton testified that she had planned on connecting Brantley and Cowling so the pair could deal directly with one another.

periodically, immediately clarifying that it was referring to cigarettes. Horton answered, "Cigarettes." Horton also testified that she was "kind of known as the cool, collective kind of person" who was usually "helpful to everybody and tr[ied] to be everybody's friend . . . ." Crum maintains he should have been allowed to cross-examine Horton to correct the false impression that she was a responsible, level-headed person who disapproved of using and selling illegal drugs.

Rule 608 of the Texas Rules of Evidence forbids inquiry into specific instances of a witness' conduct for the purpose of attacking or impeaching the witness' credibility, "except to expose bias, correct any affirmative misrepresentations made on direct examination, or demonstrate lack of capacity." *Lagrone v. State*, 942 S.W.2d 602, 613 (Tex. Crim. App. 1997). "Accordingly, when a witness, on direct examination, makes a blanket assertion of fact and thereby leaves a false impression with respect to his prior behavior or extent of his prior troubles with the law, 'he opens the door on his otherwise irrelevant past criminal history and opposing counsel may [impeach him by] expos[ing] the falsehood'" *Bennett v. State*, No. 06–14–00069–CR, 2014 WL 4799010, at *3 (Tex. App.—Texarkana September 26, 2014, no pet.) (mem. op., not designated for publication) (alterations in original) (quoting *Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007)).

In denying Crum's request, the trial court explained, "I don't recall that she left the impression, certainly not with me, and I don't believe it can be fairly characterized that she left the impression of an overarching idea of disapproving of the drug lifestyle." We agree. Horton's response to the State's question on direct examination was just that, an answer. She stated that she smoked cigarettes. We find nothing in her testimony that would have left the jury with the

35

impression that she had unusually strong feelings or opinions against the use of drugs or drug dealing.

Crum also contends that, "by excluding the evidence of [Horton]'s attempted drug transaction, and admission that [Brantley] had found marijuana from someone else, "the trial court prevented Crum from raising facts during trial that would have questioned the reliability of [Brantley]'s memory, and [Horton]'s credibility." We disagree. Nothing in Horton's proffered testimony or her text messages to Cowling showed bias or demonstrated a lack of capacity as it related to the material issue before the jury, that is, was Crum the aggressor or was he acting in self-defense. In other words, whether Horton and Brantley sold or used marihuana had no direct relevance to the issues in the case, and neither did the fact that Brantley was looking for marihuana to *buy*, or the fact that Horton was seeking a seller on his behalf, relate to Brantley's reliability in recalling the events of the evening. Thus, the trial court did not err when it limited Crum's cross-examination of Horton or when it excluded from evidence the text messages between Horton and Brantley.

We overrule this point of error.

*(5)*     *Permitting the State to Argue Good Versus Evil Was Not Error*

Crum contends that the State was improperly allowed during argument[39] to refer to him as "evil." Specifically, the State said, "There are 1189 chapters in the Bible," at which point, Crum

---

[39]Crum also contends that, during the State's closing argument, it misstated the law regarding the standpoint from which the jury was to consider his claim of self-defense. The complained-of statement is as follows:

> When you think about the castle doctrine and when you think about self-defense, the reasonable person that you're thinking of -- and they make a big deal about this being from the defendant's

objected. Outside the presence of the jury, Crum argued that, when the State used "religious references," it was doing so in "an effort to try to suggest to the jury that regardless of the facts, that somehow their religious beliefs should impact their decision-making." Crum continued, "Your Honor, and I object to any type of relevance towards that." The State told the court that it would "make it very clear that [it was] not doing that . . . ." The trial court asked the State what argument it intended to make, to which the State responded that it was going to address the difference between good and evil. The trial court instructed the State to "just refer to literature in general" and not the Bible or a specific religion. Crum then stated, "The suggestion that they should find him guilty because he's evil is a request that they disregard the law and the facts . . . ."

---

perspective, but I want you to remember the defendant's perspective. It's not [Crum] with all his pent-up rage and anger, drunk, that's not it. It's the reasonable, ordinary, and prudent person. Okay?

That person that's in your mind when you're thinking about the castle doctrine and self-defense, is it [Crum]? Is it someone that is yelling, I want to fight anybody, moments before he pulls this trigger? Someone that locks people out of the house an [sic] never says good-bye? Someone that his sister -- he has the guy at gunpoint, and he says, oh, what the heck, I'm going to put the gun down and get some licks in?

At that point, Crum objected, arguing that the State's argument was contrary to what was included in the court's charge to the jury. The State responded, "Judge, we're arguing it from the reasonable and ordinary and prudent person, which is what the jury is supposed to look at. They don't put [themselves] into the shoes of a drunk, pissed-off guy. They put them into a person that's ordinary and prudent." After the parties argued briefly, the trial court responded, "The -- definition of reasonable belief is adequate to explain the law. Argue from that perspective." The State continued with its closing argument, stating, "So when we are talking about reasonable belief, again, we're talking about an ordinary and prudent person. Is that person that's in your mind this guy who is drunk and angry, yelling?" The State then reminded the jury of Crum's behavior before and during the incident.

To preserve error in jury argument, a party must ordinarily show that he or she objected to the asserted error and persisted on the point until getting an adverse ruling. *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996). We review for an abuse of discretion a trial court's ruling on an objection asserting improper jury argument. *Whitney v. State*, 396 S.W.3d 696, 703–04 (Tex. App.—Fort Worth 2013, pet. ref'd). An abuse of discretion occurs when the trial court's decision lies outside the zone within which reasonable persons might disagree. *McCarty v. State*, 257 S.W.3d 238, 239 (Tex. Crim. App. 2008).

Following Crum's objection, the court simply stated, "The -- definition of reasonable belief is adequate to explain the law." It did not, however, make a specific ruling by sustaining or overruling Crum's objection. Thus, Crum did not persist until he received an adverse ruling to his objection. *See Cockrell*, 933 S.W.2d at 89. Moreover, the State continued arguing along the same lines as it had when Crum made his initial objection. Yet, Crum did not object at that time. We therefore find that Crum did not preserve this particular argument for our review.

The court then stated, "I've told you how to approach that particular issue. I overrule the rest of the objection." The State continued,

> You would think that the knowledge between good and evil would be a good thing because we know what's right and we know what's wrong.
> The problem becomes, as humans, that we take the knowledge of good and evil and we mix in pride and we mix in greed and we mix in anger and we mix in ego, and then we marinate it all in alcohol. And what we end up doing is we do evil to satisfy ourselves, and we try to call it good.
> So, we do evil and then say, castle doctrine, because of our knowledge. We do evil -- we cover ourselves. I'm in fear for my life (gesturing). And, we call it good.

Crum claims the State was referring to him as being evil, and, therefore, it was error for the trial court to have allowed the State to make the argument.

Permissible jury argument falls into one of four areas: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) an answer to the argument of opposing counsel, or (4) a plea for law enforcement. *Cannady v. State*, 11 S.W.3d 205, 213 (Tex. Crim. App. 2000). Even when an argument exceeds the permissible bounds of these approved areas, it will not be reversible unless the argument is extreme or manifestly improper, violates a mandatory statute, or injects into the trial new facts harmful to the accused.[40] *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000) (citing *Todd v. State*, 598 S.W.2d 286, 296–97 (Tex. Crim. App. 1980)). The prosecutor's remarks must have been a willful and calculated effort to deprive a defendant of

---

[40]In general, improper jury argument is considered to be a nonconstitutional error. *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998). Nonconstitutional error that does not affect the substantial rights of an accused must be disregarded. TEX. R. APP. P. 44.2(b). When determining whether improper jury argument affects an accused's substantial rights, courts examine the following three factors: (1) the severity of the conduct, (2) the measures taken to cure the misconduct, and (3) the certainty of the conviction absent the misconduct. *Mosley*, 983 S.W.2d at 259. If the record as a whole reflects a fair assurance that the error did not influence the jury, or had but a slight effect, the conviction must not be reversed. *Id.* at 260.

a fair and impartial trial. *Id.* (citing *Cantu v. State*, 939 S.W.2d 627, 633 (Tex. Crim. App. 1997)). An attorney is afforded wide latitude as long as his argument is supported by the evidence and made in good faith. *Stewart v. State*, 995 S.W.2d 187, 190 (Tex. App.—Fort Worth 1999, pet. ref'd).

In support of its position that its argument was not error, the State directs us to *Reese v. State*, 905 S.W.2d 631 (Tex. App.—Texarkana 1995, pet. ref'd, untimely filed). In that case, the State argued during trial,

> There is nothing more evil in this world than somebody who puts this on the street because no dope dealer can tell you where it's ultimately going to wind up, whether somebody is going to change their mind, say, I'm going to do this, and throw it in the street, or whether they're going to go sell it to a school child. No dope dealer thinks about that. Dope dealers don't care. How could you care about a human being and do something like this? You just can't.

*Id.* at 638. This Court held that the State's "argument appeared to be a reasonable deduction from the quantity of drugs Reese had when he was arrested. As such, it was not objectionable."[41]

As was the case in *Reese*, here, the State's argument was directed to specific evidence relating to Crum's claim of self-defense. The State argued that Crum's claim that he was protecting himself and his home was a pretense for shooting Cowling and that Crum's conduct was evil, not good, as Crum would have the jury believe from his testimony. We therefore find that the trial court did not err in allowing the State to make the complained-of argument.

We overrule this contention.

---

[41]On appeal, Reese argued that his trial counsel was ineffective because, among other things, his trial counsel did not object to that portion of the State's argument.

39

*(6)     None of the Four Challenged Jury Instructions Constituted Error*

Crum contends that four of the trial court's jury instructions presented reversible error.  It is well settled that a trial court must submit a charge distinctly setting forth the "law applicable to the case."  TEX. CODE CRIM. PROC. ANN. art. 36.14.  Our review of an alleged jury charge error involves a two-step process.  *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). Initially, we determine whether error occurred and then "determine whether sufficient harm resulted from the error to require reversal."  *Id.* at 731–32; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984).  The level of harm that must be shown as having resulted from the erroneous jury instruction depends on whether the appellant properly objected to the error. *Abdnor*, 871 S.W.2d at 732.[42]

---

[42]To preserve error relating to a jury charge, there must either be an objection or a requested charge.  *Vasquez v. State*, 919 S.W.2d 433, 435 (Tex. Crim. App. 1996).  A complaint must be made "with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context."  TEX. R. APP. P. 33.1(a)(1)(A).  "No talismanic words are needed to preserve error as long as the court can understand from the context what the complaint is."  *Clark v. State*, 365 S.W.3d 333, 337 (Tex. Crim. App. 2012).

When a proper objection is made at trial, a reversal is required if there is "some harm" that is likely to injure the rights of the defendant.  *Id.*  But, when the defendant fails to object to the charge, we will not reverse for jury-charge error unless the record shows "egregious harm" to the defendant.  *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005) (citing *Almanza*, 686 S.W.2d at 171).  In determining whether the error caused egregious harm, we must decide whether the error created such harm that the appellant did not have a "fair and impartial trial."  TEX. CODE CRIM. PROC. ANN. art. 36.19; *Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008); *Almanza*, 686 S.W.2d at 171; *Boones v. State*, 170 S.W.3d 653, 660 (Tex. App.—Texarkana 2005, no pet.).  "Neither the State nor the defendant has a burden to prove harm."  *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013).

*(A)     Defining Theft*

At trial, and on appeal, Crum maintains the trial court erroneously included the definition of theft because there was no evidence that Crum intended to deprive Brantley of his coat, or Cullins of her purse, for any extended period of time.[43]  We disagree.

Theft is defined as unlawfully appropriating property of another with the intent to deprive the owner of the property.  TEX. PENAL CODE ANN. § 31.03(a).  Intent to deprive may be inferred by words, actions, or conduct of the accused, but temporarily withholding property does not demonstrate intent to deprive.  *Clark v. State*, 115 S.W.2d 953, 954 (Tex. Crim. App. 1938).  The trial court's instructions must "apply the law to the facts adduced at trial."  *Gary v. State*, 152 S.W.3d 125, 127–28 (Tex. Crim. App. 2004).

Here, after realizing that Cullins' and Brantley's belongings remained inside Crum's home, the party-goers attempted to contact him multiple times via text messages and telephone calls.  In their texts, they very specifically informed Crum that their belongings were inside his house and that they needed to be allowed inside the home in order to retrieve their property.  In his brief, Crum states, "The only evidence regarding appropriation of the property was the fact that . . . Brantley's coat and . . . Cullins' purse were *left inside* when Appellant locked the door."  Crum's version of events tells only half of the story.

At trial, Crum conceded that, when he was ready to go to bed, instead of telling his guests that it was time for them to leave and allowing them to get their property, he simply locked them

_____

[43]The complained-of instruction states, "A person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property.  Appropriation of property is unlawful if it is without the owner's effective consent."

outside on the patio, denying them access to their belongings. Although he was aware that he was in possession of their personal belongings, Crum did not respond to any of their attempts to contact him, instead continuing with his personal activities inside the house. Crum testified that he would "deal" with returning their property another day. Thus, not only did Cullins and Brantley "leave" their personal belongings inside Crum's house, Crum prevented them from retrieving their property for an undetermined amount of time. When, or if, Crum actually intended to return or allow retrieval of their property was an issue left in the hands of the jury. In making that determination, the jury could have inferred from Crum's actions an intent to deprive Cullins and Brantley of their belongings.

There was sufficient evidence to support the trial court's inclusion of the definition of theft in its jury charge. We overrule this point of error.

*(B)    Failure to Retreat*

Although Crum did not object to the trial court's instruction regarding the failure to retreat, he maintains here that the court's instruction gave

> the jury the impression that [Crum] bore the burden of proving that he did not provoke [Cowling] and the he was not engaging in theft because [Crum]'s failure to establish lack of provocation and criminal activity would mean that the jury believed he tried to retreat before he was justified in defending himself.

In relation to the failure to retreat, the trial court's jury charge stated,

> A person who has a right to be present at a location where the person uses deadly force against another is not required to retreat before using deadly force in self-defense if both --
>
> 1.    the person with the right to be present did not provoke the person against whom the deadly force is used; and

42

2.      the person is not engaged in any criminal activity at the time the deadly force is used.

Therefore, in deciding whether the state has proved that the defendant did not reasonably believe his use of deadly force was necessary, you must not consider any failure of the defendant to retreat that might be shown by the evidence if you find both --

1.      the defendant did not provoke [Cowling], the person against whom the defendant used deadly force, and

2.      the defendant was not engaged in criminal activity at the time he used the deadly force.

If you do not find both 1 and 2, you may consider any failure of the defendant to retreat that might be shown by the evidence in deciding whether the defendant reasonably believed his use of deadly force was necessary.

Contrary to Crum's assertion, the trial court's instructions clearly stated that, "*in deciding whether the state has proved* that the defendant did not reasonably believe his use of deadly force was necessary, you must consider [a set of listed factors]" (Emphasis added). Moreover, as the State points out, the trial court instructed the jury, in part, "*The burden of proof throughout the trial is always on the state. The defendant does not have the burden to prove anything.* The state *must* prove every element of the offense beyond a reasonable doubt . . . ." (Emphasis added). We find Crum's reading of this portion of the trial court's jury charge to be misplaced.

Next, Crum contends the trial court's instruction regarding the failure to retreat amounted to a comment on the weight of the evidence "because it tells the jury it 'may consider any failure of the defendant to retreat that might be shown by the evidence in deciding whether the defendant reasonably believed his use of deadly force was necessary.'" Stated another way, according to

43

Crum, "[b]y effectively requiring [Crum] to disprove provocation, the instruction imposed an affirmative duty on [Crum] to retreat."

In support of his contention, Crum directs us to *Morales v. State*, 357 S.W.3d 1 (Tex. Crim. App. 2011). In *Morales*, the Texas Court of Criminal Appeals affirmatively stated, "When [Section 9.32, subsections (c) and (d),] do not apply, the failure to retreat may be considered in determining whether a defendant reasonably believed that his conduct was immediately necessary to defend himself or a third person." *Id.* at 5. On the other hand, the court indicated that a jury instruction on a general *duty* to retreat would be erroneous since it is not authorized by statute and would be a comment on the weight of the evidence. *Id.*

Here, the trial court's charge does not contain an instruction indicating that Crum had a duty to retreat. Rather, the trial court's instruction correctly instructed the jury under Section 9.32(c) about when a defendant is not required to retreat. It also correctly instructed the jury under Section 9.32(d) that, if it found that Crum met the conditions of subsection (c), then it must not consider any evidence of Crum's failure to retreat. In accordance with *Morales*, and these sections, the trial court then instructed the jury that, if it found that Crum did not meet the conditions of subsection (c), then it may consider any evidence of Crum's failure to retreat when determining whether he reasonably believed that his use of deadly force was necessary.[44] There was no error.

---

[44]Crum also directs us to *Wall v. State*, No. 02-18-00065-CR, 2019 WL 2041839, at *3–4 (Tex. App.—Fort Worth May 9, 2019, no pet.) (mem. op., not designated for publication). In *Wall*, the Fort Worth Court of Appeals stated, "The charge here not only incorrectly instructed the jury on retreat, it also informed the jury that it must 'find *against* the Defendant on the issue of self-defense,'" *id.* at *5 (emphasis added), "if it found beyond a reasonable doubt that Wall's beliefs relating to his defense were unreasonable or that a reasonable person would have retreated . . . ." *Id.* at *3.

We overrule this contention.

*(C)*     *Extraneous-Offense Evidence*

Although he did not object to the trial court's instruction on extraneous-offense evidence at trial, here, Crum contends that such instruction amounted to a comment on the weight of the evidence. The instruction stated as follows:

> During trial, you heard evidence that the defendant may have committed wrongful acts not charged in the indictment. The state offered the evidence to show the defendant's intent, to rebut the theory of self-defense, and to rebut the impression presented by the jury during the defendant's examination. You are not to consider that evidence at all unless you find beyond a reasonable doubt, that the defendant did, in fact, commit the wrongful act or acts. Those of you who believe the defendant did the wrongful act or acts may consider it.
> Even if you do find that the defendant committed a wrongful act, you may consider this evidence only for the limited purposes I have described. You may not consider this evidence to prove that the defendant is a bad person and for this reason was likely to commit the charged offense. In other words, you should consider the evidence only for the specific, limited purpose I have described. To consider this evidence for any other purpose would be improper.

Crum maintains that the instruction communicated to the jury that (1) the trial court believed Crum's prior conduct showed that he would someday commit the offense of murder, (2) Crum's belief that deadly force was necessary was unreasonable, and (3) Crum lied on cross-examination, triggering the need for rebuttal evidence. Crum then goes on to provide three illustrative examples of how the trial court could have properly charged the jury on extraneous-offense evidence. *See Crayton v. State*, 463 S.W.3d 531 (Tex. App.—Houston [14th Dist.] 2015, no pet.).

---

The instructions in this case did not include the language challenged in *Wall*. Instead, here, the instructions stated, "The State must prove, beyond a reasonable doubt, the accusation of murder," and "[t]he defendant is not required to prove self-defense. Rather, the State must prove, beyond a reasonable doubt, that self-defense does not apply to defendant's conduct."

A trial court shall refrain from commenting on the weight of the evidence in the presence of the jury during any stage of the proceedings. TEX. CODE CRIM. PROC. ANN. art. 38.05. Likewise, the trial court should not "make any remark calculated to convey to the jury its opinion of the case." *Id.*

Contrary to Crum's contention, the instruction is not a comment on the weight of the evidence. Instead, the instruction informs the jury that, if there were any testimony that Crum committed an extraneous bad act, the jurors could consider that evidence only if they found beyond a reasonable doubt that Crum had actually committed the act. Then, the trial court instructed the jury on the limited purposes for which it could consider the bad act. The instruction did not benefit the State or egregiously harm Crum.

We overrule this contention.

### (D) Self-Defense

Crum maintains the trial court's jury instructions made it optional for the jury to consider his claim of self-defense. The trial court instructed the jury,

> If you all agree the state has proved, beyond a reasonable doubt, both of the two elements above,[45] you must find the defendant 'guilty,' subject to your consideration of self-defense described above.

 "A trial court must submit a charge setting forth the 'the law applicable to the case.'" *Lee v. State*, 415 S.W.3d 915, 917 (Tex. App.—Texarkana 2013, pet. ref'd) (quoting TEX. CODE CRIM. PROC. ANN. art. 36.14). "The purpose of the jury charge . . . is to inform the jury of the applicable law

---

[45]The elements were (1) that on February 24, 2018, in Hopkins County, Texas, Crum caused the death of Cowling by shooting him with a firearm and (2) that Crum did this either intentionally or knowingly.

46

and guide them in its application." *Id*. (quoting *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007)).

Crum contends that, by instructing the jury that "you must find the defendant 'guilty,' *subject* to your consideration of self-defense described below," the trial court made it optional for the jury to consider his self-defense claim.[46] Crum contends that, instead of giving the instruction as it did, the trial court should have instructed the jury, "If you all agree the state has proved, beyond a reasonable doubt, each of the [numbered] elements listed above, you must *next* consider whether the defendant's use of force was made in self-defense."[47]

Certainly, Crum's desired instruction, which is contained in the Texas Criminal Pattern Jury Charge, clearly requires the jury to consider the defendant's self-defense claim before finding a defendant guilty. However, when we consider the entire jury charge,[48] we cannot say that the instruction given in this case made consideration of Crum's self-defense claim optional. The instruction informed the jury that any finding of guilt is "subject to *your consideration* of self-defense described below." Thus, the jury was directed to consider self-defense, which was addressed in the section immediately following the complained-of instruction. At the conclusion of the application portion of the self-defense instruction, the jury was instructed:

> If you find that the state has failed to prove, beyond a reasonable doubt, at least one of the elements listed above, you must find the defendant 'not guilty.'

---

[46]This is Crum's sole complaint regarding this instruction.

[47]*See* State Bar of Tex., *Texas Criminal Pattern Jury Charges: Defenses* § 31.5 (2015).

[48]*See Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012) ("In examining the charge for possible error, reviewing courts 'must examine the charge as a whole instead of a series of isolated and unrelated statements.'" (quoting *Dinkins v. State,* 894 S.W.2d 330, 339 (Tex. Crim. App. 1995))).

> If you all agree the state has proved, beyond a reasonable doubt, the charged offense of murder and you believe, beyond a reasonable doubt, that the defendant did not act in self-defense, you must find the defendant 'guilty.'

The entire charge was read to the jury before closing arguments. Thus, the jury was informed that a guilty verdict could not be reached until the State had proved both that Crum had committed the charged offense and that he did not act in self-defense. This necessarily required the jury to consider self-defense. Therefore, the complained-of jury instruction did not make the consideration of self-defense optional.

We overrule this contention.

*(7)    Cumulative Error Cannot Occur Without Multiple Errors*

Finally, Crum contends that the cumulative effect of the above-alleged errors deprived him of a fair trial. "It is conceivable that a number of errors may be found harmful in their cumulative effect. But we are aware of no authority that non-errors may in their cumulative effect cause error." *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999). As we explain above, we find only one error as urged by Crum. Cumulation of error, thus, did not occur.

We overrule this contention.

We affirm the trial court's judgment.


Josh R. Morriss, III
Chief Justice

48

CONCURRING OPINION

As the majority notes, Crum maintains that the trial court erred when it admitted Vance's testimony concerning blood-spatter analysis without any showing by the State that the blood-spatter evidence was reliable under the standards announced in *Kelly v. State*. *See Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992). The majority agreed with Crum, and I concur with the majority opinion. I write separately to further explain why I believe the trial court erred in admitting Vance's expert testimony over Crum's reliability objection.

Prior to Vance's testimony, Crum objected to Vance's qualifications and asked for a hearing outside the jury's presence to address that issue. According to Rule 705(b), "[b]efore an expert states an opinion or discloses the underlying facts or data, an adverse party in a civil case may—or in a criminal case must—be permitted to examine the expert *about the underlying facts or data*. This examination must take place outside the jury's hearing." TEX. R. EVID. 705(b) (emphasis added). Here, the record shows the trial court permitted Crum the hearing required by Rule 705(b). And, at least during his direct examination, Vance established his qualification to testify on that issue.[49]

---

[49]We note that the beginning inquiry in any expert witness qualification issue is Article 38.35 of the Texas Code of Criminal Procedure. *See Rhomer v. State*, 569 S.W.3d 664, 675 (Tex. Crim. App. 2019) (Hervey, J., concurring) (noting that "the first question a practitioner should ask when dealing with forensic science evidence is whether the laboratory where the analysis was performed was properly accredited" under Articles 38.01 and 38.35 and further noting that "by virtue of its rule making authority . . . , the [Texas Forensic Science Commission] might be able to abrogate Rule 702"). Nevertheless, the Commission specifically exempted "crime scene reconstruction, *including bloodstain pattern analysis*" "from the accreditation requirement by administrative rule." *See* 37 TEX. ADMIN. CODE § 651.7(a)(16) (emphasis added).

However, as the majority notes, during the Rule 705(b) hearing, Crum made an additional objection to Vance's testimony, namely, that blood-spatter evidence is unreliable.[50] The Texas Court of Criminal Appeals has held that an expert's qualifications deal with his background and experience, while reliability focuses on the subject matter of the witness' testimony. *Vela*, 209 S.W.3d at 131–35. The Texas Court of Criminal Appeals has also held that the issue of an expert witness' qualifications is distinct from the reliability and relevance of his testimony and, therefore, those issues must be evaluated independently. *Id.* at 131. In order for a court to find that witness testimony is reliable, it must find the following factors: "(a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly applied on the occasion in question." *Id.* at 133–34 (quoting *Kelly*, 824 S.W.2d at 573). As the proponent of Vance' testimony, the State bore the burden of establishing its admissibility in light of this objection. *Kelly*, 824 S.W.2d at 573.[51]

---

[50]The State argues that Crum waived this point of error because he did not object to the reliability of blood-spatter evidence at pretrial hearings in this case. It also argues that Crum's objection was too general to preserve this point for appeal. However, in the absence of a scheduling order or agreement by the parties to do otherwise, the opponent of expert testimony can object to its reliability when the evidence is offered at trial. *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 409–10 (Tex. 1998) (holding that "the complaining party must object to the reliability of scientific evidence before trial or when the evidence is offered"). In addition, Crum's counsel specifically objected, stating

> The State has not proven the scientific reliability of the blood spatter provided by this witness. They don't -- they didn't give us any type of understanding about how to properly apply this scientific training -- or scientific analysis of the blood spatter, and they've not been able to prove that it has been properly applied in this case, Your Honor.

Accordingly, Crum specifically objected that the State failed to prove the third element of the *Kelly* test: that "the technique [was] properly applied on the occasion in question." *Vela v. State*, 209 S.W.3d 128, 133–34 (Tex. 2006) (quoting *Kelly*, 824 S.W.2d at 573). Defense counsel also obtained a running objection to Trooper Vance's testimony.

[51]I assume that this testimony involves a "hard science" that is governed by the *Kelly* standard for admissibility of expert testimony rather than a "soft science" governed by the standard enunciated in *Nenno v. State*, 970 S.W.2d 549 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720 (Tex. Crim. App. 1988). I do not address this question because—regardless of which standard is applied—the third element for admissibility of

The State contends that it was relieved of the burden of establishing the reliability of blood spatter expert testimony because many courts have taken judicial notice that an expert's testimony on blood spatter is reliable. Accordingly, the State argues that the trial court did not err in allowing Vance to testify without requiring the State to first prove his testimony was reliable.

In *Hernandez v. State*, the Texas Court of Criminal Appeals held that a trial court may take judicial notice that a field of proffered expert testimony is reliable and outlined the circumstances under which it may do so. *Hernandez v. State*, 116 S.W.3d 26, 29 (Tex. Crim. App. 2003).[52] And, following the guidelines in *Hernandez*, the Waco Court of Appeals held that blood-spatter evidence meets the *Kelly* standards. *Holmes v. State*, 135 S.W.3d 178, 195 (Tex. App.—Waco 2004, no pet.). Accordingly, the State is correct that the trial court could have taken judicial notice of the reliability of blood-spatter evidence. Yet, even if we assume that the trial court took judicial

---

expert testimony—"whether the expert's testimony properly relies on or utilizes the principles involved in the field"—is the same. *Id*. at 560. It is evidence of this third element that is missing in this case.

[52]The Texas Court of Criminal Appeals stated,

> A party seeking to introduce evidence of a scientific principle need not always present expert testimony, treatises, or other scientific material to satisfy the *Kelly* test. It is only at the dawn of judicial consideration of a particular type of forensic scientific evidence that trial courts must conduct full-blown "gatekeeping" hearings under *Kelly*. Once a scientific principle is generally accepted in the pertinent professional community and has been accepted in a sufficient number of trial courts through adversarial *Daubert/Kelly* hearings, subsequent courts may take judicial notice of the scientific validity (or invalidity) of that scientific theory based upon the process, materials, and evidence produced in those prior hearings.
>
> Similarly, once some courts have, through a *Daubert/Kelly* "gatekeeping" hearing, determined the scientific reliability and validity of a specific methodology to implement or test the particular scientific theory, other courts may take judicial notice of the reliability (or unreliability) of that particular methodology.
>
> Trial courts are not required to re-invent the scientific wheel in every trial. However, some trial court must actually examine and assess the reliability of the particular scientific wheel before other courts may ride along behind. Some court, somewhere, has to conduct an adversarial gatekeeping hearing to determine the reliability of the given scientific theory and its methodology.

*Hernandez*, 116 S.W.3d at 29.

notice of this fact,[53] as the Waco Court noted, judicial notice only satisfies the first two elements of the *Kelly* test; the State must still establish that "the technique [was] properly applied on the occasion in question." *Vela*, 209 S.W.3d at 133–34 (quoting *Kelly*, 824 S.W.2d at 573); *Holmes*, 135 S.W.3d at 195 ("[W]e take judicial notice of the validity of blood spatter analysis and hold that the State was not required . . . to produce evidence on the first two criteria of *Kelly*.").

Here, the State did not establish this element either during the Rule 705(b) hearing or at any other time. It appears that the trial court overruled Crum's objection because defense counsel intended to present his own blood-spatter expert witness at trial, and therefore, the trial court was making the same ruling as to both parties. Although the trial court could have taken judicial notice of the reliability of blood-spatter evidence and made that ruling applicable to both parties, that did not relieve the State (or Crum) from establishing that "the technique [was] properly applied on the occasion in question." *Vela*, 209 S.W.3d at 133–34 (quoting *Kelly*, 824 S.W.2d at 573). Because it failed to present any evidence on the third element of the *Kelly* test, the State failed to prove that Vance's testimony was admissible.

---

[53]It could be vigorously argued that even though the trial court could have taken judicial notice, it did not. Nowhere in the record does the trial court mention the *Holmes* case or any other case holding that blood-spatter evidence is reliable. As the Eastland Court of Appeals noted in *Stirman v. State*,

> The State failed to offer any cites to any scientific materials or judicial opinions or any argument that the underlying theories of latent fingerprints, crime scene reconstruction, and blood spatter analysis were reliable. Thus, because the State failed to meet its burden to show that the scientific theories and methodologies relied upon by [the State's expert witness] Investigator Estes were reliable, the trial court erred when it permitted [the State's witness] to testify as an expert.

*Stirman v. State*, No. 11-12-00090-CR, 2014 WL 1285773, at *4 (Tex. App.—Eastland 2014, pet. ref'd) (mem. op., not designated for publication).

52

Consequently, the trial court erred when it allowed Vance to testify as an expert in blood-spatter evidence.  Nevertheless, for the reasons cited in the majority opinion, I concur that this error was harmless.


Ralph K. Burgess
Justice


Date Submitted:     August 22, 2019
Date Decided:       November 27, 2019

Do Not Publish